# CLARK, SECRETARY OF THE INTERIOR, ET AL.
# *v.* COMMUNITY FOR CREATIVE NON-
# VIOLENCE ET AL.

No. 82–1998.   Argued March 21, 1984—Decided June 29, 1984

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. BURGER, C. J., filed a concurring opinion, *post*, p. 300. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 301.

*Deputy Solicitor General Bator* argued the cause for petitioners. With him on the briefs were *Solicitor General Lee, Assistant Attorney General McGrath, Alan I. Horowitz, Leonard Schaitman,* and *Katherine S. Gruenheck.*

*Burt Neuborne* argued the cause for respondents. With him on the brief were *Charles S. Sims, Laura Macklin, Arthur B. Spitzer,* and *Elizabeth Symonds.**

JUSTICE WHITE delivered the opinion of the Court.

The issue in this case is whether a National Park Service regulation prohibiting camping in certain parks violates the First Amendment when applied to prohibit demonstrators from sleeping in Lafayette Park and the Mall in connection with a demonstration intended to call attention to the plight of the homeless. We hold that it does not and reverse the contrary judgment of the Court of Appeals.

I

The Interior Department, through the National Park Service, is charged with responsibility for the management and maintenance of the National Parks and is authorized to promulgate rules and regulations for the use of the parks in accordance with the purposes for which they were established.

---

*Ogden Northrop Lewis* filed a brief for the National Coalition for the Homeless as *amicus curiae* urging affirmance.

290

16 U. S. C. §§ 1, 1a–1, 3.[1]  The network of National Parks includes the National Memorial-core parks, Lafayette Park and the Mall, which are set in the heart of Washington, D. C., and which are unique resources that the Federal Government holds in trust for the American people.  Lafayette Park is a roughly 7-acre square located across Pennsylvania Avenue from the White House.  Although originally part of the White House grounds, President Jefferson set it aside as a park for the use of residents and visitors.  It is a "garden park with a . . . formal landscaping of flowers and trees, with fountains, walks and benches."  National Park Service, U. S. Department of the Interior, White House and President's Park, Resource Management Plan 4.3 (1981).  The Mall is a stretch of land running westward from the Capitol to the Lincoln Memorial some two miles away.  It includes the Washington Monument, a series of reflecting pools, trees, lawns, and other greenery.  It is bordered by, *inter alia*, the Smithsonian Institution and the National Gallery of Art. Both the Park and the Mall were included in Major Pierre L'Enfant's original plan for the Capital.  Both are visited by vast numbers of visitors from around the country, as well as by large numbers of residents of the Washington metropolitan area.

Under the regulations involved in this case, camping in National Parks is permitted only in campgrounds designated for that purpose.  36 CFR § 50.27(a) (1983).  No such campgrounds have ever been designated in Lafayette Park or the Mall.  Camping is defined as

"the use of park land for living accommodation purposes such as sleeping activities, or making preparations to sleep (including the laying down of bedding for the pur-

---

[1] The Secretary is admonished to promote and regulate the use of the parks by such means as conform to the fundamental purpose of the parks, which is "to conserve the scenery and the natural and historic objects and the wild life therein . . . in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  39 Stat. 535, as amended, 16 U. S. C. § 1.

pose of sleeping), or storing personal belongings, or making any fire, or using any tents or . . . other structure . . . for sleeping or doing any digging or earth breaking or carrying on cooking activities." *Ibid.*

These activities, the regulation provides,

"constitute camping when it reasonably appears, in light of all the circumstances, that the participants, in conducting these activities, are in fact using the area as a living accommodation regardless of the intent of the participants or the nature of any other activities in which they may also be engaging." *Ibid.*

Demonstrations for the airing of views or grievances are permitted in the Memorial-core parks, but for the most part only by Park Service permits. 36 CFR § 50.19 (1983). Temporary structures may be erected for demonstration purposes but may not be used for camping. 36 CFR § 50.19(e)(8) (1983).[2]

In 1982, the Park Service issued a renewable permit to respondent Community for Creative Non-Violence (CCNV) to conduct a wintertime demonstration in Lafayette Park and the Mall for the purpose of demonstrating the plight of the

---

[2] Section 50.19(e)(8), as amended, prohibits the use of certain temporary structures:

"In connection with permitted demonstrations or special events, temporary structures may be erected for the purpose of symbolizing a message or meeting logistical needs such as first aid facilities, lost children areas or the provision of shelter for electrical and other sensitive equipment or displays. Temporary structures may not be used outside designated camping areas for living accommodation activities such as sleeping, or making preparations to sleep (including the laying down of bedding for the purpose of sleeping), or storing personal belongings, or making any fire, or doing any digging or earth breaking or carrying on cooking activities. The above-listed activities constitute camping when it reasonably appears, in light of all the circumstances, that the participants, in conducting these activities, are in fact using the area as a living accommodation regardless of the intent of the participants or the nature of any other activities in which they may also be engaging."

homeless. The permit authorized the erection of two symbolic tent cities: 20 tents in Lafayette Park that would accommodate 50 people and 40 tents in the Mall with a capacity of up to 100. The Park Service, however, relying on the above regulations, specifically denied CCNV's request that demonstrators be permitted to sleep in the symbolic tents.

CCNV and several individuals then filed an action to prevent the application of the no-camping regulations to the proposed demonstration, which, it was claimed, was not covered by the regulation. It was also submitted that the regulations were unconstitutionally vague, had been discriminatorily applied, and could not be applied to prevent sleeping in the tents without violating the First Amendment. The District Court granted summary judgment in favor of the Park Service. The Court of Appeals, sitting en banc, reversed. *Community for Creative Non-Violence* v. *Watt*, 227 U. S. App. D. C. 19, 703 F. 2d 586 (1983). The 11 judges produced 6 opinions. Six of the judges believed that application of the regulations so as to prevent sleeping in the tents would infringe the demonstrators' First Amendment right of free expression. The other five judges disagreed and would have sustained the regulations as applied to CCNV's proposed demonstration.[3] We granted the Government's petition for certiorari, 464 U. S. 1016 (1983), and now reverse.[4]

---

[3] The *per curiam* opinion preceding the individual opinions described the lineup of the judges as follows:

"Circuit Judge Mikva files an opinion, in which Circuit Judge Wald concurs, in support of a judgment reversing. Chief Judge Robinson and Circuit Judge Wright file a statement joining in the judgment and concurring in Circuit Judge Mikva's opinion with a caveat. Circuit Judge Edwards files an opinion joining in the judgment and concurring partially in Circuit Judge Mikva's opinion. Circuit Judge Ginsburg files an opinion joining in the judgment. Circuit Judge Wilkey files a dissenting opinion, in which Circuit Judges Tamm, MacKinnon, Bork and Scalia concur. Circuit Judge Scalia files a dissenting opinion, in which Circuit Judges MacKinnon and Bork concur." 227 U. S. App. D. C., at 19–20, 703 F. 2d, at 586–587.

[4] As a threshold matter, we must address respondents' contention that their proposed activities do not fall within the definition of "camping" found

## II

We need not differ with the view of the Court of Appeals that overnight sleeping in connection with the demonstration is expressive conduct protected to some extent by the First Amendment.[5] We assume for present purposes, but do not decide, that such is the case, cf. *United States* v. *O'Brien*, 391 U. S. 367, 376 (1968), but this assumption only begins the inquiry. Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions. We have often noted that restrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information. *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789 (1984); *United States* v. *Grace*, 461 U. S. 171 (1983); *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 45–46 (1983); *Heffron* v. *International Society for Krishna Consciousness*,

---

in the regulations. None of the opinions below accepted this contention, and at least nine of the judges expressly rejected it. *Id.*, at 24, 703 F. 2d, at 591 (opinion of Mikva, J.); *id.*, at 42, 703 F. 2d, at 609 (opinion of Wilkey, J.). We likewise find the contention to be without merit. It cannot seriously be doubted that sleeping in tents for the purpose of expressing the plight of the homeless falls within the regulation's definition of camping.

[5] We reject the suggestion of the plurality below, however, that the burden on the demonstrators is limited to "the advancement of a plausible contention" that their conduct is expressive. *Id.*, at 26, n. 16, 703 F. 2d, at 593, n. 16. Although it is common to place the burden upon the Government to justify impingements on First Amendment interests, it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive. In the absence of a showing that such a rule is necessary to protect vital First Amendment interests, we decline to deviate from the general rule that one seeking relief bears the burden of demonstrating that he is entitled to it.

*Inc.*, 452 U. S. 640, 647–648 (1981); *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 771 (1976); *Consolidated Edison Co.* v. *Public Service Comm'n of N. Y.*, 447 U. S. 530, 535 (1980).

It is also true that a message may be delivered by conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative. *Spence* v. *Washington*, 418 U. S. 405 (1974); *Tinker* v. *Des Moines School District*, 393 U. S. 503 (1969). Symbolic expression of this kind may be forbidden or regulated if the conduct itself may constitutionally be regulated, if the regulation is narrowly drawn to further a substantial governmental interest, and if the interest is unrelated to the suppression of free speech. *United States* v. *O'Brien*, *supra*.

Petitioners submit, as they did in the Court of Appeals, that the regulation forbidding sleeping is defensible either as a time, place, or manner restriction or as a regulation of symbolic conduct. We agree with that assessment. The permit that was issued authorized the demonstration but required compliance with 36 CFR § 50.19 (1983), which prohibits "camping" on park lands, that is, the use of park lands for living accommodations, such as sleeping, storing personal belongings, making fires, digging, or cooking. These provisions, including the ban on sleeping, are clearly limitations on the manner in which the demonstration could be carried out. That sleeping, like the symbolic tents themselves, may be expressive and part of the message delivered by the demonstration does not make the ban any less a limitation on the manner of demonstrating, for reasonable time, place, or manner regulations normally have the purpose and direct effect of limiting expression but are nevertheless valid. *City Council of Los Angeles* v. *Taxpayers for Vincent, supra; Heffron* v. *International Society for Krishna Consciousness, Inc., supra; Kovacs* v. *Cooper*, 336 U. S. 77 (1949). Neither does the fact that sleeping, *arguendo*, may be expressive

conduct, rather than oral or written expression, render the sleeping prohibition any less a time, place, or manner regulation. To the contrary, the Park Service neither attempts to ban sleeping generally nor to ban it everywhere in the parks. It has established areas for camping and forbids it elsewhere, including Lafayette Park and the Mall. Considered as such, we have very little trouble concluding that the Park Service may prohibit overnight sleeping in the parks involved here.

The requirement that the regulation be content-neutral is clearly satisfied. The courts below accepted that view, and it is not disputed here that the prohibition on camping, and on sleeping specifically, is content-neutral and is not being applied because of disagreement with the message presented.[6] Neither was the regulation faulted, nor could it be, on the ground that without overnight sleeping the plight of the homeless could not be communicated in other ways. The regulation otherwise left the demonstration intact, with its symbolic city, signs, and the presence of those who were willing to take their turns in a day-and-night vigil. Respondents do not suggest that there was, or is, any barrier to delivering to the media, or to the public by other means, the intended message concerning the plight of the homeless.

---

[6] Respondents request that we remand to the Court of Appeals for resolution of their claim that the District Court improperly granted summary judgment on the equal protection claim. Brief for Respondents 91, n. 50. They contend that there were disputed questions of fact concerning the uniformity of enforcement of the regulation, claiming that other groups have slept in the parks. The District Court specifically found that the regulations have been consistently applied and enforced in a fair and non-discriminatory manner. App. to Pet. for Cert. 106a–108a. Only 5 of the 11 judges in the Court of Appeals addressed the equal protection claim. 227 U. S. App. D. C., at 43–44, 703 F. 2d, at 610–611 (opinion of Wilkey, J., joined by Tamm, MacKinnon, Bork, and Scalia, JJ.). Our review of the record leads us to agree with their conclusion that there is no genuine issue of material fact and that the most that respondents have shown are isolated instances of undiscovered violations of the regulations.

It is also apparent to us that the regulation narrowly focuses on the Government's substantial interest in maintaining the parks in the heart of our Capital in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy them by their presence. To permit camping—using these areas as living accommodations—would be totally inimical to these purposes, as would be readily understood by those who have frequented the National Parks across the country and observed the unfortunate consequences of the activities of those who refuse to confine their camping to designated areas.

It is urged by respondents, and the Court of Appeals was of this view, that if the symbolic city of tents was to be permitted and if the demonstrators did not intend to cook, dig, or engage in aspects of camping other than sleeping, the incremental benefit to the parks could not justify the ban on sleeping, which was here an expressive activity said to enhance the message concerning the plight of the poor and homeless. We cannot agree. In the first place, we seriously doubt that the First Amendment requires the Park Service to permit a demonstration in Lafayette Park and the Mall involving a 24-hour vigil and the erection of tents to accommodate 150 people. Furthermore, although we have assumed for present purposes that the sleeping banned in this case would have an expressive element, it is evident that its major value to this demonstration would be facilitative. Without a permit to sleep, it would be difficult to get the poor and homeless to participate or to be present at all. This much is apparent from the permit application filed by respondents: "Without the incentive of sleeping space or a hot meal, the homeless would not come to the site." App. 14. The sleeping ban, if enforced, would thus effectively limit the nature, extent, and duration of the demonstration and to that extent ease the pressure on the parks.

Beyond this, however, it is evident from our cases that the validity of this regulation need not be judged solely by refer-

ence to the demonstration at hand. *Heffron* v. *International Society for Krishna Consciousness, Inc.,* 452 U. S., at 652–653. Absent the prohibition on sleeping, there would be other groups who would demand permission to deliver an asserted message by camping in Lafayette Park. Some of them would surely have as credible a claim in this regard as does CCNV, and the denial of permits to still others would present difficult problems for the Park Service. With the prohibition, however, as is evident in the case before us, at least some around-the-clock demonstrations lasting for days on end will not materialize, others will be limited in size and duration, and the purposes of the regulation will thus be materially served. Perhaps these purposes would be more effectively and not so clumsily achieved by preventing tents and 24-hour vigils entirely in the core areas. But the Park Service's decision to permit nonsleeping demonstrations does not, in our view, impugn the camping prohibition as a valuable, but perhaps imperfect, protection to the parks. If the Government has a legitimate interest in ensuring that the National Parks are adequately protected, which we think it has, and if the parks would be more exposed to harm without the sleeping prohibition than with it, the ban is safe from invalidation under the First Amendment as a reasonable regulation of the manner in which a demonstration may be carried out. As in *City Council of Los Angeles* v. *Taxpayers for Vincent,* the regulation "responds precisely to the substantive problems which legitimately concern the [Government]." 466 U. S., at 810.

We have difficulty, therefore, in understanding why the prohibition against camping, with its ban on sleeping overnight, is not a reasonable time, place, or manner regulation that withstands constitutional scrutiny. Surely the regulation is not unconstitutional on its face. None of its provisions appears unrelated to the ends that it was designed to serve. Nor is it any less valid when applied to prevent camping in Memorial-core parks by those who wish to demon-

strate and deliver a message to the public and the central Government. Damage to the parks as well as their partial inaccessibility to other members of the public can as easily result from camping by demonstrators as by nondemonstrators. In neither case must the Government tolerate it. All those who would resort to the parks must abide by otherwise valid rules for their use, just as they must observe the traffic laws, sanitation regulations, and laws to preserve the public peace.[7] This is no more than a reaffirmation that reasonable time, place, or manner restrictions on expression are constitutionally acceptable.

Contrary to the conclusion of the Court of Appeals, the foregoing analysis demonstrates that the Park Service regulation is sustainable under the four-factor standard of *United States* v. *O'Brien*, 391 U. S. 367 (1968), for validating a regulation of expressive conduct, which, in the last analysis is little, if any, different from the standard applied to time, place, or manner restrictions.[8] No one contends that aside

---

[7] When the Government seeks to regulate conduct that is ordinarily nonexpressive it may do so regardless of the situs of the application of the regulation. Thus, even against people who choose to violate Park Service regulations for expressive purposes, the Park Service may enforce regulations relating to grazing animals, 36 CFR § 50.13 (1983); flying model planes, § 50.16; gambling, § 50.17; hunting and fishing, § 50.18; setting off fireworks, § 50.25(g); and urination, § 50.26(b).

[8] Reasonable time, place, or manner restrictions are valid even though they directly limit oral or written expression. It would be odd to insist on a higher standard for limitations aimed at regulable conduct and having only an incidental impact on speech. Thus, if the time, place, or manner restriction on expressive sleeping, if that is what is involved in this case, sufficiently and narrowly serves a substantial enough governmental interest to escape First Amendment condemnation, it is untenable to invalidate it under *O'Brien* on the ground that the governmental interest is insufficient to warrant the intrusion on First Amendment concerns or that there is an inadequate nexus between the regulation and the interest sought to be served. We note that only recently, in a case dealing with the regulation of signs, the Court framed the issue under *O'Brien* and then based a crucial part of its analysis on the time, place, or manner cases. *City Coun-*

from its impact on speech a rule against camping or overnight sleeping in public parks is beyond the constitutional power of the Government to enforce. And for the reasons we have discussed above, there is a substantial Government interest in conserving park property, an interest that is plainly served by, and requires for its implementation, measures such as the proscription of sleeping that are designed to limit the wear and tear on park properties. That interest is unrelated to suppression of expression.

We are unmoved by the Court of Appeals' view that the challenged regulation is unnecessary, and hence invalid, because there are less speech-restrictive alternatives that could have satisfied the Government interest in preserving park lands. There is no gainsaying that preventing overnight sleeping will avoid a measure of actual or threatened damage to Lafayette Park and the Mall. The Court of Appeals' suggestions that the Park Service minimize the possible injury by reducing the size, duration, or frequency of demonstrations would still curtail the total allowable expression in which demonstrators could engage, whether by sleeping or otherwise, and these suggestions represent no more than a disagreement with the Park Service over how much protection the core parks require or how an acceptable level of preservation is to be attained. We do not believe, however, that either *United States* v. *O'Brien* or the time, place, or manner decisions assign to the judiciary the authority to replace the Park Service as the manager of the Nation's parks or endow the judiciary with the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained.[9]

Accordingly, the judgment of the Court of Appeals is

*Reversed.*

---

cil of Los Angeles v. Taxpayers for Vincent, 466 U. S. 789, 804–805, 808–810 (1984).

[9] We also agree with Judge Edwards' observation that "[t]o insist upon a judicial resolution of this case, given the facts and record at hand, argu-

CHIEF JUSTICE BURGER, concurring.

I concur fully in the Court's opinion.

I find it difficult to conceive of what "camping" means, if it does not include pitching a tent and building a fire. Whether sleeping or cooking follows is irrelevant. With all its frailties, the English language, as used in this country for several centuries, and as used in the Park Service regulations, could hardly be plainer in informing the public that camping in Lafayette Park was prohibited.

The actions here claimed as speech entitled to the protections of the First Amendment simply are not speech; rather, they constitute conduct. As Justice Black, who was never tolerant of limits on speech, emphatically pointed out in his separate opinion in *Cox* v. *Louisiana*, 379 U. S. 536, 578 (1965):

> "The First and Fourteenth Amendments, I think, take away from government, state and federal, all power to restrict freedom of speech, press, and assembly *where people have a right to be for such purposes.* . . . Picketing, though it may be utilized to communicate ideas, is not speech, and therefore is not of itself protected by the First Amendment." (Emphasis in original; citations omitted.)

Respondents' attempt at camping in the park is a form of "picketing"; it is conduct, not speech. Moreover, it is conduct that interferes with the rights of others to use Lafayette Park for the purposes for which it was created. Lafayette Park and others like it are for all the people, and their rights are not to be trespassed even by those who have some "statement" to make. Tents, fires, and sleepers, real or feigned, interfere with the rights of others to use our parks. Of

---

ably suggests a lack of common sense." 227 U. S. App. D. C., at 33, 703 F. 2d at 600. Nor is it any clearer to us than it was to him "what has been achieved by this rather exhausting expenditure of judicial resources." *Id.*, at 34, 703 F. 2d, at 601.

course, the Constitution guarantees that people may make their "statements," but Washington has countless places for the kind of "statement" these respondents sought to make.

It trivializes the First Amendment to seek to use it as a shield in the manner asserted here. And it tells us something about why many people must wait for their "day in court" when the time of the courts is pre-empted by frivolous proceedings that delay the causes of litigants who have legitimate, nonfrivolous claims. This case alone has engaged the time of 1 District Judge, an en banc court of 11 Court of Appeals Judges, and 9 Justices of this Court.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

The Court's disposition of this case is marked by two related failings. First, the majority is either unwilling or unable to take seriously the First Amendment claims advanced by respondents. Contrary to the impression given by the majority, respondents are not supplicants seeking to wheedle an undeserved favor from the Government. They are citizens raising issues of profound public importance who have properly turned to the courts for the vindication of their constitutional rights. Second, the majority misapplies the test for ascertaining whether a restraint on speech qualifies as a reasonable time, place, and manner regulation. In determining what constitutes a sustainable regulation, the majority fails to subject the alleged interests of the Government to the degree of scrutiny required to ensure that expressive activity protected by the First Amendment remains free of uneccessary limitations.

I

The proper starting point for analysis of this case is a recognition that the activity in which respondents seek to engage—sleeping in a highly public place, outside, in the winter for the purpose of protesting homelessness—is symbolic speech protected by the First Amendment. The major-

ity assumes, without deciding, that the respondents' conduct is entitled to constitutional protection. *Ante*, at 293. The problem with this assumption is that the Court thereby avoids examining closely the reality of respondents' planned expression. The majority's approach denatures respondents' asserted right and thus makes all too easy identification of a Government interest sufficient to warrant its abridgment. A realistic appraisal of the competing interests at stake in this case requires a closer look at the nature of the expressive conduct at issue and the context in which that conduct would be displayed.

In late autumn of 1982, respondents sought permission to conduct a round-the-clock demonstration in Lafayette Park and on the Mall. Part of the demonstration would include homeless persons sleeping outside in tents without any other amenities.[1] Respondents sought to begin their demonstration on a date full of ominous meaning to any homeless person: the first day of winter. Respondents were similarly purposeful in choosing demonstration sites. The Court portrays these sites—the Mall and Lafayette Park—in a peculiar fashion. According to the Court:

> "Lafayette Park and the Mall . . . are unique resources that the Federal Government holds in trust for the American people. Lafayette Park is a roughly 7-acre square located across Pennsylvania Avenue from the White House. Although originally part of the White House grounds, President Jefferson set it aside as a park for the use of residents and visitors. It is a 'garden park with a . . . formal landscaping of flowers and trees, with fountains, walks and benches.' . . . The Mall is a

[1] The previous winter respondents had held a similar demonstration after courts ruled that the Park Service regulations then in effect did not extend to respondents' proposed activities. *Community for Creative Non-Violence* v. *Watt*, 216 U. S. App. D. C. 394, 670 F. 2d 1213 (1982) *(CCNV I)*. Those activities consisted of setting up and sleeping in nine tents in Lafayette Park. The regulations at issue in this case were promulgated in direct response to *CCNV I*. 47 Fed. Reg. 24299 (1982).

stretch of land running westward from the Capitol to the Lincoln Memorial some two miles away. It includes the Washington Monument, a series of reflecting pools, trees, lawns, and other greenery. It is bordered by, *inter alia*, the Smithsonian Institution and the National Gallery of Art. Both the Park and the Mall were included in Major Pierre L'Enfant's original plan for the Capital. Both are visited by vast numbers of visitors from around the country, as well as by large numbers of residents of the Washington metropolitan area." *Ante*, at 290.

Missing from the majority's description is any inkling that Lafayette Park and the Mall have served as the sites for some of the most rousing political demonstrations in the Nation's history. It is interesting to learn, I suppose, that Lafayette Park and the Mall were both part of Major Pierre L'Enfant's original plan for the Capital. Far more pertinent, however, is that these areas constitute, in the Government's words, "a fitting and powerful forum for political expression and political protest." Brief for Petitioners 11.[2]

The primary[3] purpose for making *sleep* an integral part of the demonstration was "to re-enact the central reality of

_____

[2] At oral argument, the Government informed the Court "that on any given day there will be an average of three or so demonstrations going on" in the Mall-Lafayette Park area. Tr. of Oral Arg. 3–4. Respondents accurately describe Lafayette Park "as the American analogue to 'Speaker's Corner' in Hyde Park." Brief for Respondents 16, n. 25.

[3] Another purpose for making sleep part of the demonstration was to enable participants to weather the rigors of the round-the-clock vigil and to encourage other homeless persons to participate in the demonstration. As respondents stated in their application for a demonstration permit:

"If there was ever any question as to whether sleeping was a necessary element in this demonstration, it should be answered by now [in light of the previous year's demonstration]. No matter how hard we tried to get [homeless persons] to come to Reaganville [the name given to the demonstration by respondents], they simply would not come, until sleeping was permitted." App. 14.

homelessness," Brief for Respondents 2, and to impress upon public consciousness, in as dramatic a way as possible, that homelessness is a widespread problem, often ignored, that confronts its victims with life-threatening deprivations.[4]    As one of the homeless men seeking to demonstrate explained: "Sleeping in Lafayette Park or on the Mall, for me, is to show people that conditions are so poor for the homeless and poor in this city that we would actually sleep *outside* in the winter to get the point across."    *Id.*, at 3.

In a long line of cases, this Court has afforded First Amendment protection to expressive conduct that qualifies as symbolic speech.    See, *e. g., Tinker* v. *Des Moines School Dist.*, 393 U. S. 503 (1969) (black armband worn by students in public school as protest against United States policy in Vietnam war); *Brown* v. *Louisiana*, 383 U. S. 131 (1966) (sit-in by Negro students in "whites only" library to protest segregation); *Stromberg* v. *California*, 283 U. S. 359 (1931) (flying red flag as gesture of support for communism).    In light of the surrounding context, respondents' proposed activity meets the qualifications.    The Court has previously acknowledged the importance of context in determining

---

[4] Estimates on the number of homeless persons in the United States range from two to three million.    See Brief for National Coalition for the Homeless as *Amicus Curiae* 3.    Though numerically significant, the homeless are politically powerless inasmuch as they lack the financial resources necessary to obtain access to many of the most effective means of persuasion.    Moreover, homeless persons are likely to be denied access to the vote since the lack of a mailing address or other proof of residence within a State disqualifies an otherwise eligible citizen from registering to vote. *Id.*, at 5.

The detrimental effects of homelessness are manifold and include psychic trauma, circulatory difficulties, infections that refuse to heal, lice infestations, and hypothermia.    *Id.*, at 14–15.    In the extreme, exposure to the elements can lead to death; over the 1983 Christmas weekend in New York City, 14 homeless persons perished from the cold.    See N. Y. Times, Dec. 27, 1983, p. A1., col. 1.

whether an act can properly be denominated as "speech" for First Amendment purposes and has provided guidance concerning the way in which courts should "read" a context in making this determination. The leading case is *Spence* v. *Washington*, 418 U. S. 405 (1974), where this Court held that displaying a United States flag with a peace symbol attached to it was conduct protected by the First Amendment. The Court looked first to the intent of the speaker—whether there was an "intent to convey a particularized message"— and second to the perception of the audience—whether "the likelihood was great that the message would be understood by those who viewed it." *Id.*, at 410–411. Here respondents clearly intended to protest the reality of homelessness by sleeping outdoors in the winter in the near vicinity of the magisterial residence of the President of the United States. In addition to accentuating the political character of their protest by their choice of location and mode of communication, respondents also intended to underline the meaning of their protest by giving their demonstration satirical names. Respondents planned to name the demonstration on the Mall "Congressional Village," and the demonstration in Lafayette Park, "Reaganville II." App. 13.

Nor can there be any doubt that in the surrounding circumstances the likelihood was great that the political significance of sleeping in the parks would be understood by those who viewed it. Certainly the news media understood the significance of respondents' proposed activity; newspapers and magazines from around the Nation reported their previous sleep-in and their planned display.[5] Ordinary citizens, too, would likely understand the political message intended by respondents. This likelihood stems from the remarkably apt fit between the activity in which respondents seek to engage

---

[5] See articles appended to Declaration of Mary Ellen Hombs, Record, Vol. 1.

and the social problem they seek to highlight. By using sleep as an integral part of their mode of protest, respondents "can express with their bodies the poignancy of their plight. They can physically demonstrate the neglect from which they suffer with an articulateness even Dickens could not match." *Community for Creative Non-Violence* v. *Watt*, 227 U. S. App. D. C. 19, 34, 703 F. 2d 586, 601 (1983) (Edwards, J. concurring).

It is true that we all go to sleep as part of our daily regimen and that, for the most part, sleep represents a physical necessity and not a vehicle for expression. But these characteristics need not prevent an activity that is normally devoid of expressive purpose from being used as a novel mode of communication. Sitting or standing in a library is a commonplace activity necessary to facilitate ends usually having nothing to do with making a statement. Moreover, sitting or standing is not conduct that an observer would normally construe as expressive conduct. However, for Negroes to stand or sit in a "whites only" library in Louisiana in 1965 was powerfully expressive; in that particular context, those acts became "monuments of protest" against segregation. *Brown* v. *Louisiana, supra*, at 139.

The Government contends that a forseeable difficulty of administration counsels against recognizing sleep as a mode of expression protected by the First Amendment. The predicament the Government envisions can be termed "the imposter problem": the problem of distinguishing bona fide protesters from imposters whose requests for permission to sleep in Lafayette Park or the Mall on First Amendment grounds would mask ulterior designs—the simple desire, for example, to avoid the expense of hotel lodgings. The Government maintains that such distinctions cannot be made without inquiring into the sincerity of demonstrators and that such an inquiry would itself pose dangers to First Amendment values because it would necessarily be content-sensitive. I find this argument unpersuasive. First, a

variety of circumstances *already* require government agencies to engage in the delicate task of inquiring into the sincerity of claimants asserting First Amendment rights. See, *e. g., Wisconsin* v. *Yoder*, 406 U. S. 205, 215–216 (1972) (exception of members of religious group from compulsory education statute justified by group's adherence to deep religious conviction rather than subjective secular values); *Welsh* v. *United States*, 398 U. S. 333, 343–344 (1970) (eligibility for exemption from military service as conscientious objector status justified by sincere religious beliefs). It is thus incorrect to imply that any scrutiny of the asserted purpose of persons seeking a permit to display sleeping as a form of symbolic speech would import something altogether new and disturbing into our First Amendment jurisprudence. Second, the administrative difficulty the Government envisions is now nothing more than a vague apprehension. If permitting sleep to be used as a form of protected First Amendment activity actually created the administrative problems the Government now envisions, there would emerge a clear factual basis upon which to establish the necessity for the limitation the Government advocates.

The Government's final argument against granting respondents' proposed activity any degree of First Amendment protection is that the contextual analysis upon which respondents rely is fatally flawed by overinclusiveness. The Government contends that the *Spence* approach is overinclusive because it accords First Amendment status to a wide variety of acts that, although expressive, are obviously subject to prohibition. As the Government notes, "[a]ctions such as assassination of political figures and the bombing of government buildings can fairly be characterized as intended to convey a message that is readily perceived by the public." Brief for Petitioners 24, n. 18. The Government's argument would pose a difficult problem were the determination whether an act constitutes "speech" the end of First Amendment analysis. But such a determination is not the end. If

an act is defined as speech, it must still be balanced against countervailing government interests. The balancing which the First Amendment requires would doom any argument seeking to protect antisocial acts such as assassination or destruction of government property from government interference because compelling interests would outweigh the expressive value of such conduct.

## II

Although sleep in the context of this case is symbolic speech protected by the First Amendment, it is nonetheless subject to reasonable time, place, and manner restrictions. I agree with the standard enunciated by the majority: "[R]estrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Ante,* at 293 (citations omitted).[6] I conclude, however, that the regulations at issue in this case, as applied to respondents, fail to satisfy this standard.

According to the majority, the significant Government interest advanced by denying respondents' request to engage in sleep-speech is the interest in "maintaining the parks in the heart of our Capital in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy them by their presence." *Ante,* at 296. That interest is indeed significant. However, neither the Government nor the majority adequately explains how prohibiting respondents' planned activity will substantially further that interest.

The majority's attempted explanation begins with the curious statement that it seriously doubts that the First

---

[6] I also agree with the majority that no substantial difference distinguishes the test applicable to time, place, and manner restrictions and the test articulated in *United States* v. *O'Brien,* 391 U. S. 367 (1968). See *ante,* at 298–299, n. 8.

Amendment requires the Park Service to permit a demonstration in Lafayette Park and the Mall involving a 24-hour vigil and the erection of tents to accommodate 150 people. *Ante,* at 296. I cannot perceive why the Court should have "serious doubts" regarding this matter and it provides no explanation for its uncertainty. Furthermore, even if the majority's doubts were well founded, I cannot see how such doubts relate to the problem at hand. The issue posed by this case is not whether the Government is constitutionally compelled to permit the erection of tents and the staging of a continuous 24-hour vigil; rather, the issue is whether any substantial Government interest is served by banning sleep that is part of a political demonstration.

What the Court may be suggesting is that if the tents and the 24-hour vigil are permitted, but not constitutionally required to be permitted, then respondents have no constitutional right to engage in expressive conduct that supplements these activities. Put in arithmetical terms, the Court appears to contend that if X is permitted by grace rather than by constitutional compulsion, X + 1 can be denied without regard to the requirements the Government must normally satisfy in order to restrain protected activity. This notion, however, represents a misguided conception of the First Amendment. The First Amendment requires the Government to justify *every* instance of abridgment. That requirement stems from our oft-stated recognition that the First Amendment was designed to secure "the widest possible dissemination of information from diverse and antagonistic sources," *Associated Press* v. *United States,* 326 U. S. 1, 20 (1945), and "to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth* v. *United States,* 354 U. S. 476, 484 (1957). See also *Buckley* v. *Valeo,* 424 U. S. 1, 49 (1976); *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 266 (1964); *Whitney* v. *California,* 274 U. S. 357, 375–378 (1927) (Brandeis, J., concurring). Moreover, the stringency of that requirement is

not diminished simply because the activity the Government seeks to restrain is supplemental to other activity that the Government may have permitted out of grace but was not constitutionally compelled to allow. If the Government cannot adequately justify abridgment of protected expression, there is no reason why citizens should be prevented from exercising the *first* of the rights safeguarded by our Bill of Rights.

The majority's second argument is comprised of the suggestion that, although sleeping contains an element of expression, "its major value to [respondents'] demonstration would have been facilitative." *Ante*, at 296. While this observation does provide a hint of the weight the Court attached to respondents' First Amendment claims,[7] it is utterly irrelevant to whether the Government's ban on sleeping advances a substantial Government interest.

The majority's third argument is based upon two claims. The first is that the ban on sleeping relieves the Government of an administrative burden because, without the flat ban, the process of issuing and denying permits to other demonstrators asserting First Amendment rights to sleep in the parks "would present difficult problems for the Park Service." *Ante*, at 297. The second is that the ban on sleeping

---

[7] The facilitative purpose of the sleep-in takes away nothing from its independent status as symbolic speech. Moreover, facilitative conduct that is closely related to expressive activity is itself protected by First Amendment considerations. I therefore find myself in agreement with Judge Ginsburg who noted that "the personal non-communicative aspect of sleeping in symbolic tents at a demonstration site bears a close, functional relationship to an activity that is commonly comprehended as 'free speech.'" *Community for Creative Non-Violence* v. *Watt*, 227 U. S. App. D. C. 19, 40, 703 F. 2d 586, 607 (1983). "[S]leeping in the tents rather than simply standing or sitting down in them, allows the demonstrator to sustain his or her protest without stopping short of the officially-granted round-the-clock permission." *Ibid.* For me, as for Judge Ginsburg, that linkage itself "suffices to require a genuine effort to balance the demonstrators' interests against other concerns for which the government bears responsibility." *Ibid.*

will increase the probability that "some around-the-clock demonstrations for days on end will not materialize, [that] others will be limited in size and duration, and that the purpose of the regulation will thus be materially served," *ante*, at 297, that purpose being "to limit the wear and tear on park properties." *Ante*, at 299.

The flaw in these two contentions is that neither is supported by a factual showing that evinces a real, as opposed to a merely speculative, problem. The majority fails to offer any evidence indicating that the absence of an absolute ban on sleeping would present administrative problems to the Park Service that are substantially more difficult than those it ordinarily confronts. A mere apprehension of difficulties should not be enough to overcome the right to free expression. See *United States* v. *Grace*, 461 U. S. 171, 182 (1983); *Tinker* v. *Des Moines School Dist.*, 393 U. S., at 508. Moreover, if the Government's interest in avoiding administrative difficulties were truly "substantial," one would expect the agency most involved in administering the parks at least to allude to such an interest. Here, however, the perceived difficulty of administering requests from other demonstrators seeking to convey messages through sleeping was not among the reasons underlying the Park Service regulations.[8] Nor was it mentioned by the Park Service in its rejection of respondents' particular request.[9]

The Court's erroneous application of the standard for ascertaining a reasonable time, place, and manner restriction is also revealed by the majority's conclusion that a substantial governmental interest is served by the sleeping ban because it will discourage "around-the-clock demonstrations for days" and thus further the regulation's purpose "to limit wear and tear on park properties." *Ante*, at 299. The majority cites no evidence indicating that sleeping engaged in as symbolic speech will cause *substantial* wear and tear on park prop-

---

[8] See 47 Fed. Reg. 24301 (1982).

[9] App. 16–17.

erty. Furthermore, the Government's application of the sleeping ban in the circumstances of this case is strikingly underinclusive. The majority acknowledges that a proper time, place, and manner restriction must be "narrowly tailored." Here, however, the tailoring requirement is virtually forsaken inasmuch as the Government offers no justification for applying its absolute ban on sleeping yet is willing to allow respondents to engage in activities—such as feigned sleeping—that is no less burdensome.

In short, there are no substantial Government interests advanced by the Government's regulations as applied to respondents. All that the Court's decision advances are the prerogatives of a bureaucracy that over the years has shown an implacable hostility toward citizens' exercise of First Amendment rights.[10]

### III

The disposition of this case impels me to make two additional observations. First, in this case, as in some others involving time, place, and manner restrictions,[11] the Court

---

[10] At oral argument, the Government suggested that the ban on sleeping should not be invalidated as applied to respondents simply because the Government is willing to allow respondents to engage in other nonverbal acts of expression that may also trench upon the Government interests served by the ban. Tr. of Oral Arg. 15, 23. The Government maintains that such a result makes the Government a victim of its own generosity. However the Government's characterization of itself as an unstinting provider of opportunities for protected expression is thoroughly discredited by a long line of decisions *compelling* the National Park Service to allow the expressive conduct it now claims to permit as a matter of grace. See, e. g., *Women Strike for Peace* v. *Morton*, 153 U. S. App. D. C. 198, 472 F. 2d 1273 (1972); *A Quaker Action Group* v. *Morton*, 170 U. S. App. D. C. 124, 516 F. 2d 717 (1975); *United States* v. *Abney*, 175 U. S. App. D. C. 247, 534 F. 2d 984 (1976).

[11] See, e. g., *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789 (1984); *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U. S. 640 (1981). But see *United States* v. *Grace*, 461 U. S. 171 (1983); *Tinker* v. *Des Moines School Dist.*, 393 U. S. 503 (1969); *Brown* v. *Louisiana*, 383 U. S. 131 (1966).

has dramatically lowered its scrutiny of governmental regulations once it has determined that such regulations are content-neutral. The result has been the creation of a two-tiered approach to First Amendment cases: while regulations that turn on the content of the expression are subjected to a strict form of judicial review,[12] regulations that are aimed at matters other than expression receive only a minimal level of scrutiny. The minimal scrutiny prong of this two-tiered approach has led to an unfortunate diminution of First Amendment protection. By narrowly limiting its concern to whether a given regulation creates a content-based distinction, the Court has seemingly overlooked the fact that content-neutral restrictions are also capable of unnecessarily restricting protected expressive activity.[13] To be sure, the general prohibition against content-based regulations is an essential tool of First Amendment analysis. It helps to put into operation the well-established principle that "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Department of Chicago* v. *Mosley*, 408 U. S. 92, 95–96 (1972). The Court, however, has transformed the ban against content distinctions from a floor that offers all persons at least equal liberty under the First Amendment into a ceiling that restricts persons to the protection of First Amendment equality—but nothing more.[14] The consistent

[12] See, *e. g.*, *Landmark Communications, Inc.* v. *Virginia*, 435 U. S. 829 (1978). It should be noted, however, that there is a context in which regulations that are facially content-neutral are nonetheless subjected to strict scrutiny. This situation arises when a regulation vests standardless discretion in officials empowered to dispense permits for the use of public forums. See, *e. g.*, *Lovell* v. *City of Griffin*, 303 U. S. 444 (1938); *Hague* v. *CIO*, 307 U. S. 496 (1939); *Shuttlesworth* v. *City of Birmingham*, 394 U. S. 147 (1969).

[13] See Redish, The Content Distinction in First Amendment Analysis, 34 Stan. L. Rev. 113 (1981).

[14] Furthermore, a content-neutral regulation does not necessarily fall with random or equal force upon different groups or different points of

314

imposition of silence upon all may fulfill the dictates of an evenhanded content-neutrality. But it offends our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.* v. *Sullivan,* 376 U. S., at 270.[15]

Second, the disposition of this case reveals a mistaken assumption regarding the motives and behavior of Government officials who create and administer content-neutral regulations. The Court's salutary skepticism of governmental decisionmaking in First Amendment matters suddenly dissipates once it determines that a restriction is not

view. A content-neutral regulation that restricts an inexpensive mode of communication will fall most heavily upon relatively poor speakers and the points of view that such speakers typically espouse. See, *e. g., City Council of Los Angeles* v. *Taxpayers for Vincent, supra,* at, 812–813, n. 30. This sort of latent inequality is very much in evidence in this case for respondents lack the financial means necessary to buy access to more conventional modes of persuasion.

A disquieting feature about the disposition of this case is that it lends credence to the charge that judicial administration of the First Amendment, in conjunction with a social order marked by large disparities in wealth and other sources of power, tends systematically to discriminate against efforts by the relatively disadvantaged to convey their political ideas. In the past, this Court has taken such considerations into account in adjudicating the First Amendment rights of those among us who are financially deprived. See, *e. g., Martin* v. *Struthers,* 319 U. S. 141, 146 (1943) (striking down ban on door-to-door distribution of circulars in part because this mode of distribution is "essential to the poorly financed causes of little people"); *Marsh* v. *Alabama,* 326 U. S. 501 (1946) (State cannot impose criminal sanction on person for distributing literature on sidewalk of town owned by private corporation). Such solicitude is noticeably absent from the majority's opinion, continuing a trend that has not escaped the attention of commentators. See, *e. g.,* Dorsen & Gora, Free Speech, Property, and The Burger Court: Old Values, New Balances, 1982 S. Ct. Rev. 195; Van Alstyne, The Recrudescence of Property Rights as the Foremost Principle of Civil Liberties: The First Decade of the Burger Court, 43 Law & Contemp. Prob. 66 (summer 1980).

[15] For a critique of the limits of the equality principle in First Amendment analysis see Redish, *supra,* at 134–139.

content-based. The Court evidently assumes that the balance struck by officials is deserving of deference so long as it does not appear to be tainted by content discrimination. What the Court fails to recognize is that public officials have strong incentives to overregulate even in the absence of an intent to censor particular views. This incentive stems from the fact that of the two groups whose interests officials must accommodate—on the one hand, the interests of the general public and, on the other, the interests of those who seek to use a particular forum for First Amendment activity—the political power of the former is likely to be far greater than that of the latter.[16]

The political dynamics likely to lead officials to a disproportionate sensitivity to regulatory as opposed to First Amendment interests can be discerned in the background of this case. Although the Park Service appears to have applied the revised regulations consistently, there are facts in the record of this case that raise a substantial possibility that the impetus behind the revision may have derived less from concerns about administrative difficulties and wear and tear on the park facilities, than from other, more "political," concerns. The alleged need for more restrictive regulations stemmed from a court decision favoring the same First Amendment claimants that are parties to this case. See n. 1, *supra*. Moreover, in response both to the Park Service's announcement that it was considering changing its rules and the respondents' expressive activities, at least one powerful group urged the Service to tighten its regulations.[17] The point of these observations is not to impugn the integrity of the National Park Service. Rather, my intention is to illustrate concretely that government agencies by their

---

[16] See Goldberger, Judicial Scrutiny in Public Forum Cases: Misplaced Trust in the Judgment of Public Officials, 32 Buffalo L. Rev. 175, 208 (1983).

[17] See Declaration of Mary Ellen Hombs, Exhibit 1kk, Record, Vol. 1.

very nature are driven to overregulate public forums to the detriment of First Amendment rights, that facial viewpoint-neutrality is no shield against unnecessary restrictions on unpopular ideas or modes of expression, and that in this case in particular there was evidence readily available that should have impelled the Court to subject the Government's restrictive policy to something more than minimal scrutiny.

For the foregoing reasons, I respectfully dissent.