**Gregory LUCE and Nicholas Newman, Plaintiffs-Appellants,**

v.

**TOWN OF CAMPBELL, WISCONSIN, and Tim Kelemen, Defendants-Appellees.**

**No. 15-2627**

United States Court of Appeals, Seventh Circuit.

Argued January 19, 2016

Decided September 22, 2017

Rehearing and Rehearing En Banc Denied November 21, 2017

Bernardo Cueto, Attorney, La Crosse, WI, Erin Elizabeth Mersino, Attorney, Great Lakes Justice Center, Lansing, MI, for Plaintiffs–Appellants.

Justin H. Lessner, Lori M. Lubinsky, Attorneys, Axley Brynelson LLP, Madison, WI, for Defendant–Appellee.

Tim Kelemen, Pro se.

Before EASTERBROOK, ROVNER, and SYKES, Circuit Judges.

EASTERBROOK, Circuit Judge.

Interstate 90 runs through the Town of Campbell, Wisconsin. The speed limit on I-90 in the Town is 65 miles per hour. Two streets and one pedestrian overpass cross the highway within the Town. A traffic survey in 2008 found that between 23,000 and 29,000 trucks and cars pass through the Town on I-90 every day.

Gregory Luce and Nicholas Newman, two members of the local Tea Party, decided that the pedestrian overpass would be a good place to draw attention to their views. The group's placement of banners bearing messages such as "HONK TO IMPEACH OBAMA" led the Town's legislature to enact an ordinance forbidding all signs, flags, and banners (other than traffic-control information) on any of the three overpasses, or within 100 feet of the end of these structures. The ordinance is content-

neutral; it does not matter what message any privately placed sign bears. *Reed v. Gilbert*, —— U.S. ——, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015). The ordinance is a time, place, and manner limit, permitting messages to be conveyed anywhere else in Campbell. But in this suit under 42 U.S.C. § 1983 Luce and Newman contend that the First Amendment (applied to the states by the Fourteenth) permits them to carry or place banners and signs *everywhere* in the Town. The district court disagreed with that contention and granted summary judgment to the Town. See 113 F.Supp.3d 1002 (W.D. Wis. 2015). The court also dismissed a claim against Tim Kelemen, formerly the Town's chief of police. 116 F.Supp.3d 915 (W.D. Wis. 2015). We start with the plaintiffs' claim against Kelemen, because his conduct may affect how to understand the genesis and enforcement of the ordinance.

When the Town's police force began to hand out citations and escort demonstrators off the pedestrian overpass, they responded by making video recordings and posting them on a website. Kelemen did not take kindly to these videos, especially because one of them showed people being removed for unfurling a large American flag. Viewers started complaining that the police were mistreating the Tea Party. Kelemen then decided to act as a vigilante—as he said in discovery, "It's just like, you know, you want to mess with us . . . we'll mess with you." Kelemen decided to "mess with" Luce by posting his name and email address on websites catering to gay men and consumers of pornography. That caused embarrassment to Luce and led to unwanted email and other attention. Kelemen also posted comments on the local newspaper's website accusing Luce of failing to pay his property taxes and other debts and asserting that his car was about to be repossessed. Kelemen tried to hide his role—he signed the comments "Bill O'Reilly"—but his identity eventually came out, and Luce sued on a constitutional theory (that Kelemen was penalizing both the Tea Party's speech on the bridge and its videos), plus state tort law.

Kelemen disgraced himself. When what he had done became known, he resigned as police chief. He was prosecuted for violating Wis. Stat. § 947.0125(2)(e) (unlawful use of a computerized communication system), pleaded no contest, and received a diversionary disposition. The district court held, however, that Kelemen had not violated Luce's rights under the First Amendment, and it relinquished supplemental jurisdiction over the state-law claims.

■ The court concluded that Kelemen was not engaged in state action when "messing with" Luce and that the First Amendment therefore did not apply (for it deals only with governmental conduct). Acting as a vigilante is not part of a police officer's job. Kelemen did some of the dirty work while on duty and used an office computer for some posts. But he did not use official information or privileged access to information. All of the facts he gathered and disclosed about Luce, such as his physical and email addresses, were available to the general public. Anyone else could have done exactly what Kelemen did. And that's why the district judge thought that he was acting in a private capacity, off on a lark and a frolic as some cases say, rather than as a police officer. The judge held that remedies under state law are the right response to Kelemen's misconduct.

■ A public employee's acts occur under color of state law when they relate to official duties. See, e.g., *Gibson v. Chicago*, 910 F.2d 1510, 1516 (7th Cir. 1990); *Hughes v. Meyer*, 880 F.2d 967, 971–72 (7th Cir. 1989). Defamation was not among

Kelemen's duties. What he did was not even a misguided effort to perform an official function. His activities could be called "related" to official duties in the sense that they were designed to injure a person who criticized Kelemen's implementation of the Town's ordinance, but the same could be said about the misconduct at issue in *Honaker v. Smith*, 256 F.3d 477 (7th Cir. 2001). There we held that a fire chief was not acting under color of state law when he burned down the house of a disgruntled citizen whom the chief had come to regard as a pest. Arson is not among a fire chief's duties, just as defamation is not among a police chief's. So we agree with the district court that state law, not § 1983, provides the appropriate remedy for Kelemen's misconduct. See also, e.g., *Latuszkin v. Chicago*, 250 F.3d 502, 505–06 (7th Cir. 2001); *Pickrel v. Springfield*, 45 F.3d 1115, 1118–19 (7th Cir. 1995).

■ Kelemen's behavior bears on this federal suit, however, by undermining his credibility. Much of the information presented to the Town's legislature, and to the district court, about the reason for the ordinance's enactment came from Kelemen. He told the legislature, and the judge, that the Tea Party's banners caused drivers to pull off the road to take photographs, produced complaints from drivers about slow and snarled traffic, and so on. Given Kelemen's misconduct, it is not possible (when acting on a motion for summary judgment) to accept his statements as truthful, even though there was no directly opposing evidence.

This gives plaintiffs an opening. They recognize that Campbell's ordinance is similar to one that was enacted by the City of Madison, Wisconsin, and sustained against constitutional challenge in *Ovadal v. Madison*, 469 F.3d 625 (7th Cir. 2006) (holding that the adoption of an ordinance like Campbell's made a constitutional challenge moot by implementing a nondiscriminatory system). See also *Ovadal v. Madison*, 416 F.3d 531, 536 (7th Cir. 2005) (remarking that constitutional problems in Madison's initial approach to the subject could be solved if the City "prohibited not just Ovadal's, but all protests and all signs on all Beltline overpasses"). But they insist that all time, place, and manner regulations require empirical support and contend that without Kelemen's evidence the Town's ordinance has none.

Plaintiffs offered some evidence of their own, in the form of a report from traffic engineer Paul Dorothy. He reached two principal conclusions: first, that 23,000 cars a day is light traffic, compared with the highway's design limit; second, that the presentation of signs and banners on overpasses is unlikely to cause "long traffic back-ups", contrary to Kelemen's submission. (Kelemen subjectively rated Campbell's portion of I-90 as unusually hazardous; Dorothy's report shows that this assertion lacks empirical support.) For its part, the Town offered some evidence independent of Kelemen's observation. Officer Casper testified that he observed a car that had pulled off the road to take pictures of signs on the overpass. The record contains a photograph of one car pulled over, with occupants taking pictures. The Town did not conduct a formal safety evaluation, however.

The paucity of evidence from anyone other than Kelemen leads us to ask whether record evidence supporting time, place, and manner restrictions is always essential. Plaintiffs say yes, relying on decisions such as *McCullen v. Coakley*, — U.S. ——, 134 S.Ct. 2518, 189 L.Ed.2d 502 (2014), and *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). *McCullen* dealt with speech

about abortion and *Renton* with the location of sexually oriented businesses. The jurisdictions that enacted those restrictions contended that those topics required distinctive regulations, and the Justices wanted some proof.

After *Reed v. Gilbert* a powerful reason is needed whenever a law classifies by speech's content. See also, e.g., *Norton v. Springfield*, 806 F.3d 411 (7th Cir. 2015). Whether or not the sorts of rules at issue in *McCullen* and *Renton* amount to content discrimination, as *Reed* understood that phrase, the Court found each classification sufficiently problematic to require an extra degree of support. But the Justices have never suggested that empirical support is required for *all* time, place, and manner limits.

Consider, for example, a limit on loud speech or music. The Supreme Court dealt with such limits in *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949), and *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Each time the Court sustained the regulation without requiring record evidence about how high decibel levels affect people subjected to noise. In *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), the Court rejected a challenge to the Park Service's ban on sleeping in Park Service units (such as the Mall) in Washington, D.C., because the ban did not distinguish by the message anyone proposed to convey. The Justices thought that the regulation likely reduced congestion and "wear and tear on park properties" (*id.* at 299, 104 S.Ct. 3065) but relied on their own assessment rather than proof in the record. A dissenting opinion criticized the Court for not demanding proof, see *id.* at 311, 104 S.Ct. 3065 (Marshall, J., dissenting), but the majority was unmoved. And it is easy to collect other decisions sustaining time, place, and manner regulations on the basis of the Justices' nonempirical assessments. See, e.g., *United States v. Kokinda*, 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (ban on solicitation on Post Office grounds); *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) (ban on literature dissemination outside designated areas of a state fair).

*Metromedia, Inc. v. San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), offers another illustration. San Diego forbade many billboards near its highways. A majority of Justices believed that a ban would be proper, given the ability of billboards to distract drivers (and the fact that many billboards are aesthetic disasters); they did not require proof of this effect in the record. See *id.* at 508–12, 101 S.Ct. 2882 (opinion of White, J., joined by Stewart, Marshall & Powell, JJ.) (the Court "hesitate[s] to disagree with the accumulated, common-sense judgments of local lawmakers" and a ban would be valid for safety and aesthetic reasons), 541, 101 S.Ct. 2882 (Stevens, J., agreeing with this conclusion but dissenting for other reasons), 559–61, 101 S.Ct. 2882 (Burger, C.J., agreeing with this conclusion but dissenting on other grounds), 569–70, 101 S.Ct. 2882 (Rehnquist, J., agreeing with the views expressed by Chief Justice Burger and Justice Stevens). A plurality of the Court found the particular statute unconstitutional because it allowed some billboards while forbidding others, discriminating by content and subject matter. But seven Justices deemed the rationale for an across-the-board ban adequate, despite the paucity of record evidence.

The cases we have been discussing do not excuse the absence of a good reason for regulating; *every* time, place, and manner regulation requires that. So if a law were to forbid the use of a megaphone

near Times Square at noon on a weekday, a court would insist that the city or state have some evidence to overcome the common understanding that the din there (and then) is already so great that a megaphone may be needed for speech to be heard at all; but a limit on megaphones during concerts in Central Park requires no such empirical justification, because the potential benefits of the rule can be appreciated without one.

A regulation of the sort the Town has adopted rests on a belief that overhead signs and banners will cause at least some drivers to slow down in order to read what the banners say, and perhaps to react to them (say, by blowing the car's horn in response to "HONK TO IMPEACH OBAMA"). Stopping to take a picture is just an extreme version of slowing down. Reading an overhead banner requires some of each driver's attention, and diverting attention—whether to banners or to cell phones and texting—increases the risk of accidents. This effect is well established for cell phones and texting and is the basis for legislation by many jurisdictions, uncontested in court as far as we are aware, though talking and texting are speech.

It does not take a double-blind empirical study, or a linear regression analysis, to know that the presence of overhead signs and banners is bound to cause some drivers to slow down in order to read the sign before passing it. When one car slows suddenly, another may hit it unless the drivers of the following cars are alert—and, alas, not all drivers are alert all the time.

Advertising signs well off a freeway don't have the same effect. But novel signs directly overhead will affect some drivers who do not slow for billboards or hotel logos. And one common finding of empirical research is that when cars travel at different speeds—as when some slow down and others don't—the risk of accidents ris-

es. A report issued by the Federal Highway Administration summarized this way: "There is evidence that crash risk is lowest near the average speed of traffic and increases for vehicles traveling much faster or slower than average.... When the consequences of crashes are taken into account, the risk of being involved in an injury crash is lowest for vehicles that travel near the median speed[.]" *Synthesis of Safety Research Related to Speed and Speed Management* (July 1998), available at https://www.fhwa.dot.gov/publications/research/safety/98154/speed.cfm. The report cites many sources for this conclusion. Plaintiffs' expert did not consider this source of risk; Dorothy's report principally addresses the likelihood that signs will lead to traffic jams. But collisions, not traffic jams, are the principal risk when cars move at different speeds.

The assessment in the agency's report has been subject to criticism, but it also has been supported by new data. Compare Kara M. Kockleman & Jianming Ma, *Freeway Speeds and Speed Variations Preceding Crashes, Within and Across Lanes*, 46 J. Transportation Research Forum 43 (Spring 2007) (not finding evidence that speed variations increase crashes), with Mohammed Quddus, *Exploring the Relationship between Average Speed, Speed Variation, and Accident Rates Using Spatial Statistical Models and GIS*, 5 J. Transportation Safety & Security 27 (2013) (finding such evidence). We do not try to resolve this controversy. It is enough to say that a state or local legislature that attempts to reduce the incidence of sudden braking on a superhighway cannot be thought to be acting irrationally or trying to suppress speech for no good reason.

■ This is enough to support the district court's rejection of plaintiffs' challenge to the no-signs-on-overpasses rule. But it does not speak to the 100-foot addi-

tion, which the Town has not even *tried* to justify, despite the fact that one plaintiff has filed an affidavit stating that he wants to demonstrate off the overpass but within the 100-foot limit and has refrained from doing so only because of the threat of prosecution.

The ordinance forbids a small "For Sale" sign on the front lawn of any house near the ends of the overpasses. (The parties tell us that two homes are within the 100-foot limits.) It bans every political sign on a home's lawn, every balloon emblazoned "Happy Birthday" for a party in the back yard, every "Merry Christmas" banner draped over the front door in December, and every "Open" sign in the door of any shop near an overpass. These prohibitions apply whether or not the sign is large enough to attract drivers' attention.

█ Time, place, and manner restrictions must serve a "significant governmental interest" and be no more extensive than necessary. See, e.g., *Community for Creative Non-Violence*, 468 U.S. at 293, 104 S.Ct. 3065. It is hard to see why signs off the highway, and too small to cause drivers to react, should be banned. Cf. *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (ban on handbills distributed through newsracks was not justified); *Ladue v. Gilleo*, 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (ban on signs on front lawns was not justified). Perhaps the Town has some justification for the 100-foot rule, but unless it produces one the district court should ensure that political demonstrations and other speech that does not jeopardize safety can proceed.

The judgment of the district court is affirmed, except to the extent that it rejects plaintiffs' challenge to the 100-foot buffer zone. With respect to that issue the judgment is vacated, and the case is remanded for further proceedings.