William **THOMAS**, et al., Plaintiffs,

v.

The **UNITED STATES** of America, et al., Defendants.

**Civ. A. Nos. 84–3552–LFO, 87–1820–LFO.**

United States District Court, District of Columbia.

Sept. 16, 1988.

As Amended Nov. 21, 1988.

Mark A. Venuti, Washington, D.C., for plaintiffs.

William Thomas, Washington D.C., pro se.

Ellen Thomas, Washington, D.C., pro se.

Concepcion Picciotto, Washington, D.C., pro se.

Robert Dorrough, Washington, D.C., pro se.

Michael Martinez, Asst. U.S. Atty., Beverly J. Burke, Asst. Corp. Counsel, Washington, D.C., for defendants.

## MEMORANDUM

OBERDORFER, District Judge.

*Pro se* plaintiffs William Thomas, Ellen Thomas, Concepcion Picciotto, Robert Dorrough, and others, individually and as organized, in various combinations, into the "White House Antinuclear Vigil" and the "Peace Park Anti–Nuclear Vigil" sue President Reagan, the Secretary of the Interior, and numerous Interior and Park Police officials for injuries allegedly arising out of plaintiffs' communicative activities in Lafayette Park, Washington, D.C.

In 1984, plaintiffs filed suit against Department of the Interior officials challenging the constitutionality of several regulations regulating the time, place, and manner of First Amendment activity near the White House and in Lafayette Park. Plaintiffs also sought damages for injuries arising out of an alleged federal conspiracy to promulgate those regulations for the purpose of infringing plaintiffs' First Amendment freedoms. In 1987, plaintiffs filed a second action against many of the same federal defendants together with News World Communications, doing business as the *Washington Times*, the Reverend Sun Myung Moon, and others associated with the newspaper and with a political association known as the Young Americans for Freedom. The 1987 complaint reiterated the constitutional challenges launched against the regulations and against federal officials in 1984. At the same time, plaintiffs broadened their constitutional tort allegations to embrace the nonfederal defendants, on a theory that the *Washington Times* had engaged in a campaign to libel plaintiffs and to discredit and, eventually, to suppress their expressive activity.

An Order issued on February 23, 1988, dismissed all counts of the 1987 complaint against all but three of the named nonfederal defendants. Because the reasoning of the February 23 Order applies with equal force to plaintiffs' claims against these three defendants as to the claims against the *Times* defendants, those claims must also be dismissed for failure to state a claim upon which relief can be granted.

The February 23 Order also consolidated plaintiffs' 1987 claims against the various Department of the Interior officials with plaintiffs' 1984 claims against those officials. Defendants in these consolidated cases move to dismiss or for summary judgment. For the reasons stated in this Memorandum, an accompanying Order grants that motion and dismisses both complaints without prejudice.

## I.

Plaintiffs have attempted to maintain a continuous anti-nuclear demonstration in front of the White House, along Pennsylvania Avenue, and in Lafayette Park. One of the individual plaintiffs commenced his vigil in 1981; other plaintiffs joined throughout the following six years. The February 23, 1988 Order recounts in some detail the factual circumstances of plaintiffs' vigil and of the communicative activity in which they are engaged. The complete factual narrative is not repeated here.

Over the course of their vigil, plaintiffs and federal law enforcement officials have engaged in an ongoing confrontation arising from plaintiffs' exercise of First Amendment rights. At the core of this chronic struggle lie several Department of the Interior regulations that establish the time, place, and manner of First Amendment activity in Lafayette Park. *See* 36 C.F.R. § 7.96(g)(5) (1987). Among other things, these regulations specify the size and number of signs that may be in the possession of an individual in the park and require that someone "attend" the signs at all times. *See* 36 C.F.R. § 7.96(g)(5)(x)(B)(2). For purposes of the regulation, to "attend" one's sign is to remain within three feet of it. *Id.* Most importantly, for purposes of this litigation, the regulations proscribe "camping" in Lafayette Park. *See* 36 C.F.R. §§ 7.96(g)(5)(x), 7.96(i).

It is undisputed that plaintiffs have been repeatedly warned, cited, arrested, and convicted for violating one or another of these regulations. Plaintiff Thomas alone has been tried for such infractions in this Court at least a dozen times since 1982. *See* Federal Defendants' Motion to Dismiss or for Summary Judgment, Statement of Material Facts, ¶¶ 1–10 (recounting specific instances of citation and arrest).

Plaintiffs challenge these regulations on two fronts. Claiming a cause of action under 42 U.S.C. §§ 1983, 1985(3), and 1986, as well as *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and various common law tort theories, plaintiffs seek damages both against those responsible for promulgating the regulations and against those who have enforced them against participants in the vigil. Moreover, plaintiffs pray for declaratory and injunctive relief invalidating the regulations themselves on constitutional grounds.

## II.

■ Plaintiffs' damage claims against the federal defendants must fail. Those claims center on a theory that the regulations themselves, and the emergent pattern of their enforcement, reveal a conspiracy among Department of the Interior and Park Police officials to quell plaintiffs' twenty-four hour First Amendment vigil in Lafayette Park. The 1987 complaint enlarged the conspiracy theory to embrace private defendants who allegedly contributed to the plot by publishing unflattering criticism of plaintiffs' demonstration and the content of their expression.

Neither the 1984 nor the 1987 complaint, however, satisfies the standards that govern the assertion of such constitutional tort claims under sections 1983 or 1985(3). As elaborated in some detail in the February 23, 1988 Order, section 1983 cannot support an action against *federal* actors arising out of actions taken under color of *federal* law, as is the case when federal officials promulgate and then enforce a federal regulation. *See Thomas v. News World Communications*, 681 F.Supp. 55, 67 (D.D.C. 1988), and cases there collected.

Moreover, again as discussed in the previous Order, the claims advanced in both actions fall short of the heightened pleading standard imposed on civil rights complaints under *Hobson v. Wilson*, 737 F.2d 1, 30 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985), and *Martin v. Malhoyt*, 830 F.2d 237, 258 (D.C.Cir.1987). Indeed, as *Martin* emphasizes, the policies underlying the imposition of a heightened pleading standard are most compelling where, as here, civil rights claims are brought against a public official. The requirement that plaintiffs asserting such claims "come forward with 'nonconclusory allegations of evidence [if they are]

to proceed to discovery on the claim'" operates by design "to protect federal officials' freedom of action from the 'fear of damage suits.'" *Martin,* 830 F.2d at 257 (quoting *Hobson,* 737 F.2d at 29), 250 n. 32 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982)). The heightened pleading standard in actions against government officials also serves to shield public officials from becoming unduly enmeshed in protracted discovery. *See id.* at 257. None of the damage claims can survive defendants' motion to dismiss.

## III.

■ Plaintiffs' claim for injunctive and declaratory relief raises closer questions. Plaintiffs claim that the regulation codified at 36 C.F.R. § 7.96(g)(5)(x)(B), which prohibits the placement of unattended signs in Lafayette Park, "plac[es] arbitrary, capricious, and unwarranted restrictions" on those who "wish[ ] to demonstrate" there. 1987 Complaint at ¶ 64. Plaintiffs imply that abusive and selective enforcement of this regulation, *id.* at ¶ 65, has resulted in an unconstitutional infringement of their First Amendment rights, *id.* at ¶ 107. Similarly, plaintiffs cite numerous arrests by Park Police officers for violations of the "camping" and "storage of property" regulations, codified at 36 C.F.R. § 7.96(i), to support a general allegation that these regulations are being enforced in a manner that violates the First Amendment. It is beyond question that all three regulations constitute valid time, place, and manner restrictions on the exercise of First Amendment rights in Lafayette Park. The constitutionality of the "camping" regulations has been explicitly upheld by the Supreme Court. *See Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (*"CCNV"*). Plaintiffs acknowledge the Supreme Court's ruling on this question. *See* Plaintiffs [sic] Opposition to Federal Defendants' Motion to Dismiss or for Summary Judgment [hereinafter Plaintiffs' Opposition (2) ] at 26 n. 10.

The challenged three-foot sign attendance requirement, codified at 36 C.F.R. section 7.96(g)(5)(x)(B)(2), was upheld against constitutional challenge in *United States v. Musser,* Cr. No. 87–157 (D.D.C. June 17, 1987) (Richey, J.) [available on WESTLAW, 1987 WL 13131]. *See* Federal Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction and a Temporary Restraining Order at 4. Plaintiffs advance no argument compelling a contrary ruling in this action. It is important to note, in this regard, that the *CCNV* Court made it clear that the judiciary is not to substitute its own judgment for that of the Department of the Interior by evaluating the wisdom and necessity of protective parkland regulation such as the "unattended structure" proscription plaintiffs now challenge. *CCNV,* 468 U.S. at 299, 104 S.Ct. at 3072.

Plaintiffs' challenge to the Park Police's enforcement of these indisputably valid regulations against them raises more difficult questions. Plaintiffs allege a pattern of arrests and seizures of property that exceed, in their view, the appropriate scope of enforcement of the regulations. *See, e.g.,* Complaint (1) at ¶¶ 64–71. Relying on that pattern, plaintiffs claim that defendant Hodel and two Assistant Solicitors for the Department of Interior, as the ultimate supervisors of the Park Police, have pursued a policy intended to prohibit demonstrations and protests altogether in Lafayette Park "on an incremental basis." *See id.* at ¶¶ 84–86. Yet, central to plaintiffs' claims, as expressed in both actions, lies their contention that

[t]he [Lafayette Park] regulations have ... had the propensity or effect to be enforced in such a manner as to effectively disrupt or terminate every ... form of legitimate communication in which plaintiffs were engaged ..., as well as subjecting plaintiffs to unend[ing] mental anguish, and a judicial system whose patience for "repeat offenders" might be wearing a bit thin.

Plaintiffs' Statement of Material Facts in Dispute, filed with Plaintiffs' Opposition to Federal Defendants' Motion to Dismiss, or for Summary Judgment (No. 87–1820)

(filed Oct. 28, 1987) [hereinafter Plaintiffs' 2d Statement of Facts] at ¶ 22.

■ Plaintiffs thus raise a serious vagueness challenge to the regulations. Regulations of the sort at issue here are *criminal* laws. " 'No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids.' " *Bouie v. City of Columbia*, 378 U.S. 347, 351, 84 S.Ct. 1697, 1701, 12 L.Ed. 894 (1964) (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939)). In order to conform to the due process component of the Fifth Amendment, a criminal provision must

> define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.

*Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) (citing, *inter alia*, *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed. 2d 222 (1972) and *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972)). Accordingly, under the void-for-vagueness doctrine, criminal statutes, as well as administrative regulations carrying penal sanctions, must be held unconstitutional when they fall short of this standard. *See Grayned*, 408 U.S. at 108, 92 S.Ct. at 2298. Vagueness is an especial evil where the criminal provision " 'abut[s] upon sensitive areas of basic First Amendment freedoms' [because] it 'operates to inhibit the exercise of [those] freedoms.' " *Id.* at 109, 92 S.Ct. at 2299 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372, 84 S.Ct. 1316, 1323, 12 L.Ed.2d 377 (1964), and *Cramp v. Board of Public Instruction*, 368 U.S. 278, 287, 82 S.Ct. 275, 280, 7 L.Ed.2d 285 (1961)). Vague time, place, and manner regulations cause citizens to steer wider of the unlawful zone than they would if the boundaries of the forbidden areas were clearly marked. *See United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers*, 413 U.S. 548, 577–81, 93 S.Ct. 2880, 2896–98, 37 L.Ed.2d 796 (1973) (hereinafter *Letter Carriers*) (subjecting Civil Service regulation that prohibits participation in partisan politics to scrutiny under vagueness doctrine and concluding that regulation is constitutional); *Keeffe v. Library of Congress*, 777 F.2d 1573, 1581 (D.C.Cir.1985) (applying "the degree of precision required by *Letter Carriers*" to all regulations "validly promulgated under an enabling statute").

In *Kolender v. Lawson, supra,* the Supreme Court observed that, although the vagueness doctrine "focuses both on actual notice to citizens and arbitrary enforcement," its most important aspect " 'is not actual notice, but ... the requirement that a legislature establish minimal guidelines to govern law enforcement.' " 461 U.S. at 357–58, 103 S.Ct. at 1858–59 (quoting *Smith v. Groguen*, 415 U.S. 566, 574, 94 S.Ct. 1242, 1248, 39 L.Ed.2d 605 (1974)). *Kolender* held unconstitutionally vague a California penal statute that required persons who loitered or wandered on the streets to provide a "credible and reliable" identification and to account for their presence when detained by a police officer. Finding that the "credible and reliable" standard provided insufficient particularity "for determining what a suspect has to do in order to satisfy the requirement," the Court ruled the statute "unconstitutionally vague on its face because it encourages arbitrary enforcement...." *Id.* 461 U.S. at 358, 361, 103 S.Ct. at 1858, 1860.

Plaintiffs here report a series of incidents over the past six years in which one, some, or all of them were arrested, threatened with arrest, or otherwise confronted by Park Police officers regarding alleged violations of the Lafayette Park regulations. *See* Memorandum Opinion, Report & Recommendation of Magistrate Burnett (No. 84–3552, filed Jan. 23, 1987) at 8–14 (summarizing factual allegations contained in 1984 complaint); Plaintiffs' Motion for Additional Discovery and for Leave to Perfect Service of Process, Statement of Claims and Issues for Trial, and Response to Magistrate's Report and Recommendations (filed in 84–3552 on March 6, 1987 by

counsel Mark Venuti) at 17–20 (characterizing defendants' reaction over time to plaintiffs' persistent demonstration as a "campaign of harassment and unlawful arrest"); Plaintiffs' 2d Statement of Material Facts at ¶¶ 2–12 (narrating incidents in 1986 and 1987). Defendants do not contest the claim that plaintiffs have been repeatedly arrested for violations of the "camping" and other regulations and have had property seized by Park Police in conjunction with their expressive activities in Lafayette Park. *See* Federal Defendants' Statement of Material Facts Not in Dispute (filed August 29, 1986, in C.A. No. 84–3552) [hereinafter Defendants' 1st Statement of Facts] at ¶ 2; Federal Defendants' Statement of Material Facts Not in Dispute (filed in C.A. No. 87–1820) [hereinafter Defendants' 2d Statement of Facts] at ¶¶ 1–10. Defendants do, however, deny that the regulations, as written or as enforced against plaintiffs, are unconstitutionally vague. *See* Federal Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction and Temporary Restraining Order at 23.

Plaintiffs maintain that they sincerely want to conduct their demonstration within the boundaries of legitimate time, place, and manner restrictions. They contend that they have attempted to "clarify with the Secretary of Interior or his delegates the terms and conditions which would have enabled a law abiding person to accommodate a protest like [plaintiffs'] with the valid laws regulating the use of public parks." Memorandum in Support of Plaintiff's [sic] Notice of Filing [hereinafter Notice of Filing] at 3. Indeed, plaintiffs proffer evidence of persistent correspondence to this end with, among others, the Assistant Secretary for Fish and Wildlife and Parks, *id.* at Exhibit 6 (letter from plaintiffs dated July 21, 1984), defendant Secretary of the Interior, *id.* at Exhibit 10 (letter from plaintiffs dated April 28, 1986), the Director of Public Affairs for the National Park Service, *id.* at Exhibit 13 (letter from plaintiffs dated May 17, 1986), and defendants' counsel, *id.* at Exhibit 19 (letter from plaintiffs' counsel dated March 26, 1987). These letters reveal a sustained effort by plaintiffs to ascertain the precise meaning and scope of the Lafayette Park regulations in order to avoid both criminal sanctions and the concomitant interruption of their expressive demonstration.

Plaintiffs' uncertainty centers on two particular elements of the Park regulations: the ban on "camping" codified at 36 C.F.R. section 7.96(i) and the ban on the storage of personal property, contained within the ban on camping. *See* Plaintiffs' Response to Federal Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction and Temporary Restraining Order (filed in 87–1820, July 27, 1987 at 2–3). The regulation provides:

> Camping is defined as the use of park land for living accommodation purposes such as sleeping activities, or making preparations to sleep ..., or storing personal belongings....

36 C.F.R. § 7.96(i).

Defendants and other associated with the Department of the interior have made a considerable effort to specify the acts that, in their view, fall within the area of legitimate expressive activity untouched by these regulations. Although they have refused to meet with plaintiffs to discuss the restrictions in person, defendants have engaged in extensive correspondence with plaintiffs and their representatives regarding the precise requirements imposed by the "camping" and "storage of property" rules. *See* Federal Defendants' Opposition to Motion for Preliminary Injunction at Exhibits 3–9. For example, towards the end of March 1987, the Department of the Interior issued a memorandum entitled "Permit Conditions" to demonstrators in Lafayette Park, which memorandum plaintiffs acknowledge having received. *Id.* at Exhibit 3; *see* Plaintiffs' Notice of Filing at Exhibit 15 (letter dated March 27, 1987 from plaintiffs to official who signed memorandum and referring to contents). The memorandum reminds all demonstrators that their activities are subject to, among other things, the proscription of "camping or using park land for living accommodations purposes." Further, the memorandum gives notice that the Regional Director of

National Capital Parks had imposed additional conditions on all demonstrations, including the following:

> Property may not be stored in the Park, including, but not limited to construction materials, lumber, paint, tools, household items, food, tarps, bedding, blankets, sleeping bags, luggage, and other personal property. (In this regard, certain personal property that is reasonably required by a demonstration participant during any one 24–hour period will not be considered to violate this permit condition. Such property may include items such as a coat, a thermos, and a small quantity of literature. However, the quantity of these items may not exceed that which is reasonably necessary in a 24–hour period)....

Defendants' Opposition, Exhibit 3 at 2.

Defendant Robbins, Assistant Solicitor for National Capital Parks, Department of the Interior, communicated a similar definition in May of 1986 to plaintiff Picciotto in response to her letter of April 28, 1986 requesting a statement about "precisely what is meant by the term 'storage of personal property.'" Robbins replied:

> [T]he storage of property regulations ... do not prohibit the storage of a modest quantity of ... items.... Specifically, it is my position that you are permitted to have a limited quantity of literature, writing material, rainwear, an umbrella, and a couple of thermoses containing coffee and lunch, and a camera and a tape recorder, if you choose. Also I do not believe that it is unreasonable to have small quantities of plastic to cover those items in inclement weather.

*Id.* at Exhibit 4. This letter appears to summarize the Department of Interior's position with respect to the *nature* of personal property acceptable under the "storage" regulations. Moreover, Interior officials made clear that "personal property and literature that is actually in use or that will be reasonably required during any one 24–hour period is not considered to violate the storage violations." *Id.* at Exhibit 6 (letter dated May 15, 1986, from Interior Solicitor to Arthur B. Spitzer, Legal Director,

ACLU). This position is repeated in letters from the Department to various plaintiffs and to interested parties throughout May of 1986. *See id.* at Exhibits 5–7. This correspondence suggests that, at least as between plaintiffs and policymakers within the Department of the Interior, an understanding has been attempted concerning which items of personal property demonstrators may possess.

Yet, a crucial area of uncertainty remains. Resolving *which* items may accompany a demonstrator does not clarify the *quantity* of possessions a demonstrator may maintain in Lafayette Park. Responding to a letter from the ACLU to the Chief of the United States Park Police questioning plaintiffs' repeated arrests, an Assistant Solicitor, National Capital Parks, asserted that

> [plaintiff] Picciotto frequently has in her possession a large quantity of bags and boxes containing numerous personal belongings. The problem is not so much the nature of the items Ms. Picciotto has in her possession but the quantity of items, a quantity that could not realistically be used in the space of one day. When Ms. Picciotto has a quantity of these items in her possession in the Park, she is in violation of the storage regulations and is subject to appropriate enforcement action.

*Id.* at Exhibit 6. The Solicitor could be no more explicit in defining the precise "quantity" of permitted items that would render a demonstrator vulnerable to criminal sanctions than to suggest that Picciotto "limit the quantity of materials she keeps in Lafayette Park." *Id.* Nonetheless, he maintained, the position that literature or personal property "reasonably required during any one 24–hour period is not considered to violate the storage regulations ... has been communicated to Park Police and forms the touchstone for their enforcement of the storage regulations." *Id.*

A similar problem persists with respect to the element of the regulation which bars use of the park "for living accommodation purposes such as sleeping activities, or marking preparations to sleep." Several bench trials of plaintiffs charged with il-

legal camping have featured swearing matches between police testifying that one of the plaintiffs was observed to be sleeping and the alleged camper testifying that he or she was not asleep. The sleeping-therefore-camping issue is troubling because, if a person is in the park 24 hours per day, for days on end, it is judicially noticeable that some of that time must be consumed by sleeping. It is also judicially noticeable that casual dozing in a park is a generally accepted American tradition but for the regulation which forbids use of a national park for living accommodations. An alleged camper's claim to living accommodations elsewhere does not yield a clean cut issue for decision because, for example, it is entirely possible for a person to maintain more than one living accommodation. As the regulation is drawn and administered, a decision by a plaintiff, the police, or a court as to whether one of the plaintiffs is maintaining an impermissible living accommodation in the park is seldom free from reasonable doubt.

Thus, like the identification regulation at issue in *Kolender, supra,* the camping and storage regulation presently in dispute vests significant discretion in the police to determine whether an individual demonstrator's conduct conforms to the law being enforced. According to the California Court of Appeals, "credible and reliable" identification was "identification 'carrying reasonable assurance that the identification is authentic and providing means for later getting in touch with the person who has identified himself.'" *Kolender,* 461 U.S. at 357, 103 S.Ct. at 1858. (quoting *People v. Solomon,* 33 Cal.App.3d 429, 108 Cal. Rptr. 867 (1973)). It was left to the California police to decide whether a suspect had provided "credible and reliable" identification, just as the Lafayette Park regulations delegate to the U.S. Park Police the decisions as to how much personal property one "reasonably require[s] during one 24–hour period" or what constitutes a living accommodation. *Kolender* held that this delegation "necessarily 'entrust[s] lawmaking "to the moment-to-moment judgment of the policeman on his beat."'" *Id.* 461 U.S. at 361, 103 S.Ct. at 1860 (quoting *Smith,*

415 U.S. at 575, 94 S.Ct. at 1248, quoting *Gregory v. Chicago,* 394 U.S. 111, 120, 89 S.Ct. 946, 951, 22 L.Ed.2d 134 (1969) (Black, J., concurring)).

The same flaw threatens to render the camping and storage regulations unconstitutionally vague. As was true of the *Kolender* statute, the Park regulations

"furnish[ ] a convenient tool for 'harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure'" ... and "confers on police a virtually unrestrained power to arrest and charge persons with a violation."

*Id.* 461 U.S. at 360, 103 S.Ct. at 1860 (quoting, *inter alia, Papachristou,* 405 U.S. at 170, 92 S.Ct. at 847, and *Lewis v. City of New Orleans,* 415 U.S. 130, 135, 94 S.Ct. 970, 973, 39 L.Ed.2d 214 (1974) (Powell, J., concurring in the result)). Even absent a finding that the Park Police officers have taken advantage of such opportunity in dealing with plaintiffs, the Department of the Interior, like the State of California, must "establish standards by which the officers may determine whether the suspect has complied with the ... [regulations]." *Id.* 461 U.S. at 361, 103 S.Ct. at 1860.

Plaintiffs' experience proves that violation of the Lafayette Park regulations results in repeated deprivation of liberty through arrest, seizure of property, and, perhaps most seriously, deprivation of access to an important public forum for the exercise of First Amendment rights. Were the camping regulation to stand only on its own terms, the regulation's enforcement might well be enjoined on the grounds that its proscription is too vague to serve the interest, emphasized in *Kolender,* of restraining the prosecutorial discretion exercised by the individual Park Police officer on his or her own beat.

■ Nonetheless, precedent in this area teaches that the potentially unconstitutional vagueness of a regulation may be ameliorated through procedures providing an avenue whereby an authoritative interpretation of the restriction may be obtained

before an individual hazards conduct that may fall within its proscriptive scope. In *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982), the Supreme Court rejected a pre-enforcement facial challenge on First Amendment overbreadth and vagueness grounds to a municipal ordinance that required businesses wishing to sell drug paraphernalia to secure a license to do so. Sale of such items without a license exposed the vendor to daily fines. Reversing a Court of Appeals decision that the regulation was unconstitutionally vague, the Court observed:

> The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment.

*Id.* at 498, 102 S.Ct. at 1193. The Court listed several factors that should be considered when evaluating the constitutional significance of a regulation's vagueness. Included among these was whether

> the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.

*Id.* (footnote omitted).

Similarly, in *Letter Carriers,* the Court upheld against a vagueness challenge a regulation implementing the Hatch Act's restrictions on political activity by federal civil servants. Acknowledging that "[t]here might be quibbles about the meaning of" particular phrases defining the proscribed political activity, 413 U.S. at 577–78, 93 S.Ct. at 2896–97, the Court determined that the challenged regulations met constitutional standards of clarity. The Court emphasized the availability to individual civil servants of interpretive rulings regarding the permissibility of particular forms of political activity:

> It is also important in this respect that the Commission has established a procedure by which an employee in doubt about the validity of a proposed course of conduct may seek and obtain advice from the [Civil Service] Commission and thereby remove any doubt there may be

as to the meaning of the law, at least insofar as the Commission itself is concerned.

*Id.* at 580, 93 S.Ct. at 2897. *Cf. Houston v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 2513, 96 L.Ed.2d 398 (1987) (holding invocation of *Pullman* abstention doctrine inappropriate where local ordinance's language "is plain and its meaning unambiguous").

■ As there was for the civil servants in *Letter Carriers* and for the drug paraphernalia vendors in *Hoffman Estates,* there exists in the present situation an avenue for particularized interpretation of the regulations restricting the time, place, and manner of plaintiffs' First Amendment activity in Lafayette Park. Department of the Interior regulations establish a permit procedure whereby those who wish to demonstrate in areas designated as the "National Capital Region parks," which areas include Lafayette Park and other memorial sites, may apply for and receive authorization to carry out a specific activity within those areas.

Although not required to obtain a permit because their vigil involves fewer than twenty-five participants, *see* 36 C.F.R. § 7.96(g)(2)(i), plaintiffs could pursue this avenue and have in the past availed themselves of the permit procedure for finite periods. Moreover, they have gained authorization thereby to conduct their demonstration according to standards that refine the rather amorphous definition of "camping" found in the regulation itself. *See* Permit Application Form attached as Appendix A. Specifically, the standard permit application requests "[p]lans for the proposed activity," including "the complete time schedule for the activity." *Id.* at ¶ 10. In addition, the application directs potential demonstrators to "[l]ist all props, stages, sound equipment, and other items to be provided.... (Include approximate number and size(s) of supports, standards, ... necessary medical/sanitary facilities and other similar items)." *Id.* at ¶ 11(a). The permit that is ultimately issued if such an application is granted, as was the case with plaintiffs' permit in December of 1987, bears the same reference number that ap-

pears on the application and would seem to reflect authorization of the particular demonstration described by the applicants in the application itself. *See* Permit attached as Appendix B.

The permit procedure reflects a fact-specific communication between a potential demonstrator and the law enforcement agency that carries the responsibility as well as the authority to enforce the time, place, and manner regulations that constitute the background rules for all demonstrations in National Park areas. Hence, the permit procedure provides a mechanism for generating practical and comprehensible standards for plaintiffs' conduct of a twenty-four hour vigil. As indicated, the application itself invites a detailed catalogue of the type and quantity of personal property the demonstrator wishes to possess in the park. Moreover, the applicant may indicate the length of time he or she desires to continue the expressive activity. In the course of processing these applications, the Park Service has the opportunity to reject certain aspects of the proposed demonstration and to authorize only those belongings or the duration of demonstration that the Department of the Interior deems appropriate under the regulations.

Given the availability of this individualized interpretative mechanism, the Lafayette Park camping regulation, although certainly less than clear when considered in isolation, escapes the twin evils of vagueness examined in *Kolender.* Not only may plaintiffs and other prospective demonstrators conform their prospective conduct to a standard that is specific and comprehensible, but they should be shielded by grant of a specific permit from arbitrary and discriminatory enforcement in the form of " 'a standardless sweep [that] allows [Park Police], prosecutors, and juries to pursue their personal predilections.' " *Kolender,* 461 U.S. at 358, 103 S.Ct. at 1858. (quoting *Smith,* 415 U.S. at 575, 94 S.Ct. at 1248).

An example is the permit system implementing regulations that address demonstrations on the grounds of the U.S. Capitol. *Community for Creative Non–Violence v. Carvino,* 660 F.Supp. 744 (D.D.C.

1987), approved a regulation issued by the Capitol Police Board creating a permit system for demonstrations requiring props on Capitol grounds. Permits issued under that regulation required demonstrators to absent themselves and to remove their props from the demonstration site for some time during each twenty-four hour period as evidence that they were not installing themselves on the grounds in a continuous or permanent way. So here, plaintiffs may wish to include in their permit applications, or defendants may wish to include in the permits ultimately issued, some condition relating to a period of time each week during which the demonstrators will remove themselves from Lafayette Park and a specific list of the quantity or dimension of each item in the possession of each demonstrator. Such a permit conditioned on an itemized list of possessions and a prescribed period of absence from the park could provide a crystal clear basis for determination by plaintiffs, law enforcement authorities and courts as to whether or not a particular plaintiff (or a person similarly situated) is "us[ing] park land for living accommodation purposes" and, therefore, "camping" there under the terms of 36 C.F.R. § 7.96(i). Plaintiffs in the present actions may pursue definitive interpretation of the camping proscription *as it relates specifically to their twenty-four hour vigil* through the existing permit procedure. The permit application's acceptance or rejection will reflect the Department of the Interior's authoritative ruling that the demonstration plaintiffs describe does or does not constitute "camping." Thus, the grant of that permit could operate as a commitment by the agency and by the Park Police that, at least during the period covered by the permit, the plaintiffs' activity, if confined within the bounds described in the application, will not constitute a "camping" violation. Refusal of a particular permit could be tested in court in a civil context, a forum much more appropriate than criminal court for adjudication of the delicate balance required by the Constitution in cases of this kind.

Until plaintiffs have applied for such a permit and the Department of Interior or

its delegate have acted on such a permit, plaintiffs' constitutional challenge to the Lafayette Park regulations on vagueness grounds must fail. Accordingly, an accompanying Order dismisses both complaints, without prejudice.

OMB CLEARANCE NO:
1024–0021
Expires 2/29/89

## APPENDIX A

### NATIONAL PARK SERVICE, NATIONAL CAPITAL REGION
### APPLICATION FOR A PERMIT TO CONDUCT A DEMONSTRATION OR SPECIAL EVENT IN PARK AREAS AND APPLICATION FOR A WAIVER OF NUMERICAL LIMITATIONS ON DEMONSTRATIONS FOR WHITE HOUSE SIDEWALK * AND/OR LAFAYETTE PARK

Dec. 18, 1987
Date of this application

1. Individual and/or organization sponsor(s) W. Thomas and Ellen Thomas

 Address(es) 1440 N ST. NW. #410, Washington, DC 20005
 Telephone Nos. (include area code) Day (202) 462-0757 Evening 462-0757
2. This is an application for a permit to conduct a DEMONSTRATION XX
 SPECIAL EVENT _____ (For definitions, see instructions.)
3. This is an application for a WAIVER OF THE NUMERICAL LIMITATIONS on certain demonstrations. Yes __ No X. (A waiver is required if it is expected that a demonstration on the White House Sidewalk * will include more than 750 participants or that a demonstration in Lafayette Park will include more than 3000 participants.)
4. Date(s) of proposed activity: From 12-21-87 To 12-28-87
 Month Day Month Day
 Year Year

 Time: Begin 00:01 (a.m.) (p.m.) Terminate: 24:00 (a.m.) (p.m.)
5. Location(s) of proposed activity. (Include assembly and dispersal areas.)
 24 sq. ft. on the south sidewalk of Lafayette Park, west of the center panel
6. Purpose of proposed activity. To promote and demonstrate the re-solution of conflict through patience, understanding, and reason.
7. Estimated maximum number of participants. (If more than one park area is to be used, list numbers separately for each area.) three

8. Will cleanup people be provided for the area? XX yes __ no How will they be identified?
 By name (see above para. 1.)

9. Person(s) in charge of activity. (One person must be listed as in charge of the activity. If different individuals are to be in charge of various activities at different locations, each must be listed.)

* (The "White House Sidewalk" is the sidewalk between East and West Executive Avenues, on the south side of Pennsylvania Avenue N.W.)

Person in charge W. Thomas
Address 1440 N St. NW #410, Washington, DC 20005
Telephone Nos. (Include area code) Day (202) 462-0757 Evening 462-0757

10. Plans for proposed activity. (Include a list of all principal speakers and the complete time schedule for the activity. Include proposed route of any march or parade, and

plans for the orderly termination and dispersal of the proposed activity which might affect the regular flow of city traffic.) _____

We propose to demonstrate individual responsibility and moral commitment to our religious principle that "sin is to value one's own pleasure or comfort above the life of another" by maintaining a continuous, 24–hour presence WITHOUT what might reasonably be considered living accomodations, to illustrate that the value of a human being is best measured by the being's spirit (i.e. soul/mind) rather than its monetary net worth. We will seek and/or welcome public dialogue at all hours, day and night.

NOTE: Our "presence" will be "continuous" excepting we will leave the Park area to wash, launder our clothes, prepare food, store personal property, and perform all eliminatory and other biological bodily functions. None of the aforesaid functions will be performed in the Park. We may engage in short-term, intermittent, INVOLUNTARY sleep during the course of our presence, but only as nature demands.

11. (a) List all props, stages, sound equipment, and other items to be provided by applicant/sponsor. (Include approximate number and size(s) of supports, standards, and handles; necessary medical/sanitary facilities and other similar items.) _____

2 signs; 1 flag; 1 insulated bag per person (during cold weather, to be removed when not in use); literature (not to exceed 2,500 pieces at any one time); literature trays; one piece of 20 mm. plastic (10 ft. × 12 ft.); pencils, pens, writing and editing materials (to be contained in one box measuring 4 in. × 6 in. × 18 in.); books (not to exceed 10); camera; tape recorder; umbrellas (1 per person); 1 water jug; 1 broom; 1 blanket per person to sit on; 1 plastic "Great Peace March" crate (12″ × 12″ × 18″, approx.); no more food than might reasonably be consumed during a 24–hour period.

(b) If boxes, crates, coffins, or similar items will be used, state whether they are to be carried opened or closed, their proposed size, the materials constructed from, and their proposed contents and use. _____

 small speaker's platform

12. (a) Do you have any reason to believe or any information indicating that any individual, group, or organization might seek to disrupt the activity for which this application is submitted? Yes

(b) If YES, list each such individual, group, or organization, with all information as to each, including addresses and telephone numbers.

Washington TIMES (and/or the Unification Church), 3600 New York Avenue NE, Washington, D.C. Upon information published and from personal experience we believe this organ will place our form above our substance and attempt to disrupt our activities by telling the public that we are ugly and "anti-American," because of editorial ideological opposition to the substance of our message.

Young Americans for Freedom, national headquarters in Wilmington, Delaware, precise local address currently unknown. Upon personal experience we believe members of this organization may resort to actual physical violence against us because of ideological opposition to the substance of our message.

Nevertheless, in spite of potential unpleasantness, we do not require any special protection or surveillance, convinced (from experience) that God, and our commitment to nonviolence as the only path to peace, protect us.

13. Marshals: (a) Will applicant/sponsor furnish marshals? (Required for waivers of numerical limitations and for demonstration activities held simultaneously on White House sidewalk and Lafayette Park.) Yes __ No X. If YES how many marshals will be furnished?_____

(b) Person(s) responsible for supervision of marshals (for each location):
 Location(s) Not applicable._____
 APPLICATION NOT VALID UNLESS SIGNED

**714**

| | |
|---|---|
| MIDDLE OF THE ROAD | W. Thomas |
| Position of person filing application | Signature of person filing application |

Day 462-0757 Evening Same
Telephone Nos. of person filing application

 W. Thomas 1440 N St. NW #410, D.C. 20005

| | |
|---|---|
| Typed or printed name of person filing application | Address of person filing application |

APPENDIX B

United States Department of the Interior

NATIONAL PARK SERVICE
NATIONAL CAPITAL REGION
1100 OHIO DRIVE, S.W.
WASHINGTON, D.C. 20242

87–1024

PUBLIC GATHERING PERMIT

Date: December 21, 1987

In accordance with Park Regulations as contained in C.F.R., Title 36, Chapter 1, Section 50.19, permission is granted to conduct a public gathering to the following:

W. Thomas and Ellen Thomas

(Person(s) and, or Organization(s)

Date(s) December 21, 1987 to December 28, 1987

Time: Starting: 12:01 a.m. Ending: 11:59 p.m. (continuous)

Location(s) 24 sq. ft. on the south sidewalk of Lafayette Park, west of the center panel

Purpose(s) To promote and demonstrate the resolution of conflict through patience understanding and reason.

Anticipated Number of Participants 3

Person(s) in Charge W. Thomas

Address(es) 1440 N. St., NW #410, Washington, D.C. 20005

Telephone Nos. Day 462-0757 Evening 462-0757

This permit is granted subject to the following conditions:

1. Permittee and all participants authorized herein must comply with all of the conditions of this permit and with all reasonable directions of the United States Park Police.

2. All sidewalks, walkways, and roadways must remain unobstructed to allow for the reasonable use of these areas by pedestrians, vehicles, and other park visitors. PLEASE READ ATTACHED REGULATIONS REGARDING SIGNS & STRUCTURES IN LAFAYETTE PARK AND ADDITIONAL PERMIT CONDITIONS APPLICABLE TO YOUR DEMONSTRATION ACTIVITIES.

3. All laws, rules, and regulations applicable to the area covered by this permit remain in effect.

4. No fee may be collected, donations solicited, nor commercial activity conducted, and no articles, except those expressing views through printed matter, such as newspapers, pamphlets, posters, buttons, or bumper stickers, may be offered for sale.

5. The area must be left in substantially the same condition as it was prior to the activities authorized herein, and all litter shall be placed in the trash containers provided.

6. This permit is applicable only for the use of the area designated above, and during the times designated above, or in any area as may hereafter be designated by the United States Park Police.

7. The use of sound amplification equipment, other than hand-portable sound amplification equipment to be used for crowd control purposes only, is prohibited on the White House Sidewalk (South 1600 Pennsylvania Avenue, N.W., sidewalk between East Executive Avenue and West Executive Avenue). All sound amplification equipment shall be limited so that it will not unreasonably disturb nonparticipating persons in, or in the vicinity of, the area.

8. The National Park Service reserves the right to immediately revoke this permit at any time should it reasonably appear that the public gathering presents a clear and present danger to the public safety, good order or health, or if any conditions of this permit are violated.

Manus J. Fish
—————————————
Regional Director,
—————————————
National Capital Region
—————————————
By: [Illegible]
for Al Dale
—————————————
Chief, Division of
—————————————
Public Events

United States Department of the Interior
NATIONAL PARK SERVICE
NATIONAL CAPITAL REGION
1100 OHIO DRIVE, S.W.
WASHINGTON, D.C. 20242
PERMIT CONDITIONS

This is to notify you of restrictions applicable to your demonstration activities. Whether you are demonstrating under permit or pursuant to the small-group exemption to permit requirements, you must comply with regulations applicable to park lands and demonstrations found at 36 C.F.R. Parts 1 through 7. We would especially note the following activities that are prohibited in all park areas:

1. Injuring federal property, including snow fencing, grass, and other vegetation or structures (See 36 C.F.R. § 2.1(a) and § 2.31);

2. Failing to have dogs or cats entirely under control and caged or on a leash not more than six feet long (See 36 C.F.R. § 2.15); and

7. Camping or using park land for living accommodation purposes (See 36 C.F.R. § 7.96(i)).

Further, special regulations applicable to Lafayette Park, found at 36 C.F.R. § 7.96(g)(5)(x), impose additional restrictions on demonstrations in that park area. These regulations restrict the size, number, and use of stationary signs in Lafayette Park and prohibit the use of structures, except certain speaker's platforms, there. These regulations should be carefully studied before carrying on a demonstration in Lafayette Park.

In addition, pursuant to 36 C.F.R. § 7.96(g)(5)(xii)(B) and § 7.96(g)(5)(xiii), the Regional Director, National Capital Parks, imposes the following additional conditions on all demonstrations occurring in Lafayette Park:

1. Property may not be stored in the Park, including, but not limited to construction materials, lumber, paint, tools, household items, food, tarps, bedding, blankets, sleeping bags, luggage, and other personal property. (In this regard, certain personal property that is reasonably required by a demonstration participant during any one 24–hour period will not be considered to violate this permit condition. Such property may include items such as a coat, a thermos, and a small quantity of literature. However, the quantity of these items may not exceed that which is reasonably necessary in a 24–hour period);

2. Signs or other objects may not be attached to lamp posts, trees, or structures in the Park;

3. Construction activities, including, but not limited to painting of signs, may not be undertaken in the Park;

4. All materials used in demonstration activities must be safe for use in public areas, for example, signs must be held or secured so as not to fall on pedestrians and supports must not pose a tripping, or other hazard;

5. Sound equipment may not be used at such a volume as to unreasonably disturb nonparticipating persons in the area;

6. Activity on the sidewalks must allow for an eight-foot clearance for the passage of pedestrians, emergency vehicles, and trash removal carts;

7. Activities on the sidewalks may not result in damage to or loosening of sidewalk bricks, such prohibited activities include but are not limited to: staking, chipping, nailing or wedging materials to or between bricks;

8. Activities may not obstruct access to park benches, trash receptacles or adjacent lawn areas; and

9. Demonstrators will be required to move their materials upon the request of National Park Service personnel when park maintenance is necessary.

If you have questions regarding these regulations or permit conditions, please contact Sandra Alley, Associate Regional Director, Public Affairs, at 485–9666, or Rick Merryman on her staff at 485–9660.

(s) Al Dale
_____

Associate Regional Director
Public Affairs

---

**ORDER**

For the reasons stated in the memoranda filed on February 23, 1988, and on today's date, it is this 16th day of September, 1988, hereby

ORDERED: that the complaints in Civil Action No. 84–3552–LFO and Civil Action No. 87–1820–LFO should be, and are hereby, dismissed without prejudice.