### UNITED STATES of America

v.

### Stephen SEMPLE, a/k/a Sunrise S. Harmony, Defendant.

### Crim. No. 88–235–LFO.

United States District Court,
District of Columbia.

Dec. 8, 1988.

---

John F. Finnegan, Jr., Asst. U.S. Atty., Washington, D.C., for U.S.

Stephen Semple, Washington, D.C., pro se.

## MEMORANDUM

OBERDORFER, District Judge.

### I.

Defendant Stephen Semple, a/k/a Sunrise S. Harmony, is before the Court on an Information charging violation of 36 C.F.R. § 7.96(i)(1). He is one of a small group of individuals maintaining over the last several years a self-styled "vigil" in Lafayette Park, a site authoratively identified and protected as appropriate for peaceful demonstrations on public and religious issues. *See* 36 C.F.R. § 7.96(g); *A Quaker Action Group v. Morton*, 516 F.2d 717, 725 (D.C. Cir.1975) (holding that Lafayette Park "constitute[s] a unique situs for the exercise of First Amendment rights"). Although demonstrations are generally permissible, National Park Service regulations prohibit "camping" in Lafayette Park. *See id.* at § 7.96(i)(1). These regulations define camping as

> the use of park land for living accommodation purposes such as sleeping activities, or making preparations to sleep (including the laying down of bedding for the purpose of sleeping), or storing personal belongings, or making any fire, or using any tents or shelter or other structure or vehicle for sleeping or doing any digging or earth breaking or carrying on cooking activities.

*Id.*

In 1984, one of their number claimed, not without reason, a need to know the parameters of their rights under the First Amendment in Lafayette Park and their duties under the several federal regulations relating, for example, to camping in national parks and filed a suit for damages, declaratory judgment and injunctive relief. *Thomas v. United States*, Civil Action No. 84–3552–LFO (D.D.C. Nov. 21, 1984). While granting a motion of the United

States to dismiss in that case, this Court noted, among other things, that:

> Over the course of their vigil, plaintiffs and federal law enforcement officials have engaged in an ongoing confrontation arising from plaintiffs' exercise of First Amendment rights.

> .        .        .        .        .

> It is undisputed that plaintiffs have been repeatedly warned, cited, arrested, and convicted for violating one or another of these regulations. Plaintiff Thomas alone has been tried for such infractions in this Court at least a dozen times since 1982.

*Thomas v. United States*, 696 F.Supp. 702, 704 (D.D.C.1988).

Defendant himself had been convicted by Magistrate Arthur L. Burnett on November 17, 1987, for violating the camping regulation, and that conviction was affirmed by this Court on December 22, 1987. In that case, defendant took the stand and acknowledged on cross-examination that he was in Lafayette Park almost 24 hours a day. On the basis of that admission, this Court affirmed the Magistrate's conviction of defendant for camping, for that admission proved beyond a reasonable doubt that defendant was guilty of use of park land for living accommodation purposes such as sleeping activities. See Order filed this day in *United States v. Semple*, Crim. No. 87–0466–LFO (D.D.C.1988). The 1987 case came before the Court for sentencing on February 11 and June 8, 1988. In an effort to conform defendant's conduct to the requirements of the regulation and in consideration of the apparent futility of confinement as a means of achieving conformity by defendant and those engaged with him in his "vigil" in Lafayette Park, this Court, on February 11, 1988, placed defendant on probation on special conditions,[1] as slightly modified on June 8, 1988, requiring that:

1. While in Lafayette Park, defendant may have in his possession only the following items of personal property, in addition to literature used in the course of his First Amendment activity: one raincoat, one umbrella, one coat, other clothing necessary for one person during one twenty-four hour period, a camera, a tape recorder, two blankets, one thermos, toilet articles, a supply of food no greater than that required for one person during one twenty-four hours period, and an amount of plastic necessary to cover these articles in inclement weather....;

2. While in Lafayette Park, defendant shall not have in his possession a sleeping bag, tarpaulin, duffel bag, or any other item suitable for the storage of clothing or other personal belongings;

3. Defendant shall conform to the representations made by him in his demonstration permit application, completed December 21, 1987. Specifically, defendant shall "leave the Park area to wash, launder [his] clothes, prepare food, store personal property, and perform all ... biological bodily functions";

4. Defendant shall remove himself from Lafayette Park for at least thirty-five (35) hours, not necessarily to run consecutively, during every seven-day period.

*Id.*, Order of June 8, 1988, at 2–3.

While under these probation conditions, defendant was arrested on the pending charge on April 8, 1988. The arresting officer stated that he

> observed a subject, later identified as Stephen Semple, laying on the sidewalk with a blanket covering his entire body. The subject was surrounded by food, blankets, and sleeping bags. The subject was cited for camping.

Violation Notice No. 057782, dated April 8, 1988 (filed June 17, 1988).

Before any information was filed,[2] the defendant moved to dismiss the pend-

---

1. These special conditions were adapted from permits issued by the National Park Service from time to time to defendant and others maintaining the "vigil" in Lafayette Park.

2. Fed.R.Crim.P. 7(a) requires all federal offenses to be prosecuted either by indictment or by information. The Court ruled on October 6, 1988, that the government could not prosecute this action based on the "Violation Notice," in essence the "ticket" issued by the arresting offi-

ing case on grounds, among others, that the regulation allegedly violated by defendant trenches upon his First Amendment right to maintain a "continuous presence in Lafayette Park [as] the product of a sincerely held religious belief" and that the "regulation is unconstitutionally vague as applied." Motion to Dismiss Information (Sept. 23, 1988) at 4–5. In that motion, he necessarily admitted that he was "on probation as a result of an earlier conviction." *Id.* at 5. He further claimed that during the interim between that conviction and this arrest, the defendant "had made earnest attempts to steer from what is considered unlawful towards what is considered lawful." *Id.* He pointed out that he had actually applied for, and received, a permit from the National Park Service to conduct the very activity for which he was arrested on April 8, 1988. *Id.* The permit that defendant cited as authority for this proposition, however, was for a demonstration from December 26, 1987, to January 1, 1988. *Id.* at Exhibit C. On November 10, 1988, the Court denied the motion to dismiss, except as to an allegation of selective prosecution, which was to be decided after hearing testimony on the merits at trial. Given defendant's probationary status, the officer's testimony at trial of his awareness of that status and his prior observations of defendant at "his" site in Lafayette Park, and the paucity of evidence presented by defendant on this issue at trial, the officer's decision to arrest defendant without arresting others behaving similarly in the immediate vicinity cannot be said to constitute selective enforcement. Accordingly, an accompanying Order will deny defendant's motion to dismiss the information.

On October 7, 1988, the United States finally filed an information alleging that on April 8, 1988, the defendant "used park land for living accommodation purposes such as sleeping activities, making preparations to sleep (including the laying down of bedding for the purposes of sleeping), and storing personal belongings" in violation of 36 C.F.R. § 7.96(i)(1).

The information against defendant came on for trial by the Court without jury on November 10, 1988. At that trial, defendant represented himself. The United States called as its only witness the arresting officer, Park Police Private Kevin Fornshill. Officer Fornshill testified on direct examination that on April 8, 1988, he observed defendant lying down on a plastic tarp between two signs, with his head and body entirely covered by blankets. Near the signs were garbage bags filled with French bread. Officer Fornshill then testified that he asked defendant to identify the property that was his. Defendant claimed the two signs, two blankets, the tarp, a guitar and a guitar case, and a bookbag. When defendant was unable to provide some form of identification, Officer Fornshill arrested him. During direct examination, a series of photographs taken on April 8, 1988, by Officer Fornshill were also admitted into evidence.

On cross-examination by defendant *pro se*, Officer Fornshill conceded that he had no direct evidence attributing to defendant any of the property at the demonstration site other than the property defendant claimed. The officer conceded that the food, some nearby blankets not being used by defendant, and some nearby sleeping bags could have belonged to other individuals. On re-direct examination, Officer Fornshill also conceded that he never asked any of the other individuals in the area whether this additional property belonged to them. The only basis for his conclusion that the property belonged to defendant was its proximity—within seven to ten feet of defendant—and its presence on the site of "defendant's vigil."

The defense called Eric Christ, who testified that he delivers bags of bread to Lafayette Park every day to feed the demonstrators and others. Christ also testified that he observes others leaving food, blankets, and sleeping bags at defendant's vigil, but asserted that these items were for the use of all people, ranging from the

cer, filed on June 17, 1988. On October 7, 1988, the government filed a "superseding" informa-

tion.

homeless to wayward travelers, not necessarily for defendant in particular.

Finally, after being informed of his privilege against self-incrimination, defendant waived the privilege and testified on his own behalf. After submitting into evidence several passages from a book on the philosophy of Jesus, defendant testified that the extra blankets, food, and sleeping bags were at his site not for his own use, but for others to use if needed. He also insisted that he was not sleeping when discovered by Officer Fornshill on April 8, 1988, and that he was not using Lafayette Park for living accommodation purposes.

On cross-examination, however, defendant stated that most of the time he sleeps in Lafayette Park, although he occasionally sleeps elsewhere. Responding to an inquiry from the Court, defendant stated that he spends at least four hours a day out of the park, but that this time is usually spent shopping for and cooking food. Defendant did not assert that the time he spends out of the park is generally spent sleeping.

## II.

The defendant and others who are maintaining vigils in Lafayette Park may be eccentric. But they have stood up day and night for their beliefs in spite of repeated arrests and convictions and the dangers encountered when sleeping unprotected from the weather and other perils that lurk in the middle of a city at night. Their protests have been peaceful. They are not venal criminals, and application of criminal sanctions to them puts strain on the criminal justice system. That system is designed to protect the public from crime, to condemn and punish criminals, and to deter others from committing crime. The justification for condemning and punishing a peaceful protester like defendant is not immediately apparent. The effectiveness of the criminal sanction as a protection of the public or as a deterrent to repetition when applied to persons like defendant is also questionable.

As was suggested in *Thomas*, there exists for groups of demonstrators of 25 or more a judicially reviewable permit process with conditions that are enforceable, if necessary, by civil injunction. *See A Quaker Action Group, supra; cf. Community for Creative Non–Violence v. Carvino*, 660 F.Supp. 744 (D.D.C.1987). It could be extended by the National Park Service to regulate persons who conduct, alone or in small numbers, a continuing demonstration such as defendant's so-called "vigil." Such a process, unlike the blunt instruments of criminal prosecutions, would provide a mechanism for defining exactly what is required of persons in defendant's situation.[3] Indeed, were it not for the availability of the permit process to clarify the limits of the camping regulation, that regulation might well be unconstitutionally vague as applied to defendant and others similarly situated. *See Thomas, supra*, 696 F.Supp. at 709–11.

■ Nevertheless, no permit was sought by or issued to defendant for his demonstration on April 8, 1988. Furthermore, the Supreme Court has explicitly upheld the constitutionality of the camping regulation against a First Amendment challenge. *See Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). Thus, Semple's only available defense is on the facts.

■ The information charges violation of two "prongs" of the camping regulation:

3. For example, by granting defendant's permit application dated December 23, 1987, and attached as Exhibit 3 to defendant's Motion to Dismiss Information, the National Park Service effectively permitted defendant to demonstrate from December 26, 1987, to January 2, 1988, with

2 signs; one musical instrument per person; one amplifier per instrument; 1 insulated bag per person (during cold weather, to be removed when not in use); literature (not to exceed 2,500 pieces at any one time); literature trays; one piece of 20 mm. plastic per person (10 ft. × 12 ft.); pencils; pens, writing and editing materials; books (not to exceed 10); one book bag per person; umbrellas (1 per person); 1 water jug; 1 broom; 2 blankets per person to sit on and/or wrap up with during cold weather; no more food than might reasonably be consumed during a 24–hour period.

(1) making preparations to sleep and storing personal belongings and (2) "sleeping activities." The government did not prove the "storage of property" prong beyond a reasonable doubt. The only items for which the government adduced direct evidence of possession by defendant were: two signs, one bookbag, two blankets, two pieces of plastic, a guitar, and a guitar case. Possession of these materials does not violate the conditions of defendant's probation. *See United States v. Semple,* —— F.Supp. ——, Crim. 87–0466–LFO, Order of June 8, 1988. Nor does possession of these items, in all the circumstances here, constitute using the park for living accommodation purposes.

While the government sought to prove "storage of property" by inference using evidence of additional items—large bags of bread, a pile of blankets, and some sleeping bags—in the immediate vicinity, the government never adequately established that the additional property belonged to defendant or was controlled by him. Indeed, Officer Fornshill testified that he never inquired of the other people in defendant's immediate vicinity whether the property at issue belonged to them. Defendant denied that this property was his, and there was no proof to the contrary beyond a reasonable doubt. The presence of all of these items may be evidence of camping by someone. But their presence near defendant does not establish his criminal responsibility for the storage of the items.

■ The "sleeping activities" prong is another matter. The Supreme Court has interpreted 36 C.F.R. § 7.96(i)(1) as including a ban on "overnight sleeping." *Clark, supra,* 468 U.S. at 295, 104 S.Ct. at 3070. Discussing that regulation, the Court in *Clark* held:

> We have difficulty, therefore, in understanding why the prohibition against camping, *with its ban on sleeping overnight,* is not a reasonable time, place, or manner regulation.

*Id.* at 297, 104 S.Ct. at 3071 (emphasis added).

Obviously, the information does not specifically charge defendant with "sleeping overnight." It does, however, charge him with, *inter alia,* using Lafayette Park for living accommodation purposes such as "sleeping activities" and "making preparations to sleep." Overnight sleeping is simply the Supreme Court's interpretation— and perhaps even its implicit limitation on language that might otherwise preclude mere napping on a sunny afternoon—of the more general regulatory terms. As stated in *Thomas, supra,* 696 F.Supp. at 709, "casual dozing in a park is a generally accepted American tradition but for the regulation which forbids use of a national park for living accommodations." By charging "sleeping activities," the information sufficiently charges defendant with "overnight sleeping." While the Sixth Amendment requires that a defendant in a criminal case have notice of the "nature and cause of the accusation" against him, the sufficiency of an information "depends upon whether it clearly informs the defendant of the precise offense of which he is accused so that he may prepare his defense." *United States v. Conlon,* 628 F.2d 150, 156 (D.C.Cir.1980), *cert. denied,* 454 U.S. 1149, 102 S.Ct. 1015, 71 L.Ed.2d 304 (1982). Because "sleeping activities" is a somewhat broader term than "overnight sleeping," the former term plainly encompasses the latter. In any event, its use in the information provided defendant with sufficient notice of precisely the activity for which he was being prosecuted. Therefore, if the government has proved beyond a reasonable doubt that defendant was "sleeping overnight" in Lafayette Park, defendant must be found guilty. The government has met that burden in this case.

■ At least two interpretations of "sleeping overnight" are conceivable. First, the Supreme Court may have intended its interpretation of the camping regulation to be taken literally: "sleeping overnight" could mean sleeping from sunset to sunrise without interruption. Such an interpretation, however, would be excessively technical and could effectively render the camping regulation a nullity. It is unlikely that either the National Park Service or the

Supreme Court intended that result. Indeed, the Supreme Court has identified the government's regulatory interest to be "preserving park lands" and stated that "[t]here is no gainsaying that preventing overnight sleeping will avoid a measure of actual or threatened damage to Lafayette Park." *Clark, supra,* 468 U.S. at 299, 104 S.Ct. at 3072. The more sensible interpretation relies on common usage. "Overnight sleeping," while it may mean more, means at least that sleep necessary for a human being to sustain his or her life over time in reasonably good health.

■ Although proving "overnight sleeping" may often be difficult, *see Thomas, supra,* 696 F.Supp. at 708–9, circumstantial evidence and reasonable inferences therefrom establish beyond a reasonable doubt that, before and at the time of defendant's arrest, it was his practice to "sleep overnight" in Lafayette Park and not elsewhere. Defendant testified, without compulsion, that although he was away from the park for as many as four hours in a 24 hour day, he did not use that time for sleeping. If he did not sleep outside of the park, and he needs sleep, as all humans do, to sustain his life over time in reasonably good health, he must necessarily have been using the park for "overnight sleeping." This reasonable inference is confirmed by photographs admitted as Government Exhibits 1(b), (c), (d), (f), (g), (h), (n), (o), (p), (q), (r), (t), (u), and (v), and the testimony of Officer Fornshill, all of which demonstrate that in the afternoon of April 8, 1988, defendant was lying on a sidewalk in Lafayette Park with his head and body buried under a blanket.

Defendant is not saved by the fact that he may well have been in substantial compliance with the conditions of his probation when he was arrested on April 8, 1988. The probation conditions were established to provide the National Park Service, the United States Probation Office, the Court, and defendant with some fairly simple, objective tests for compliance. If defendant violated the conditions of his probation, he had clearly violated the regulation, and his probation could be revoked without the need for a difficult revocation hearing focusing on the relatively amorphous question of whether defendant had used the park for "living accommodation purposes." The inverse, however, is not true. If defendant complied with the conditions of his probation, he was not necessarily in compliance with the camping regulation. Conditioning defendant's probation on his spending at least 35 hours every seven days outside of the park gave defendant an opportunity to use that time to get elsewhere the sleep he would need to sustain himself and function over time in reasonably good health. If he had done that, there might well have been a reasonable doubt as to whether he was guilty of overnight sleeping in Lafayette Park. But defendant chose to spend his time outside of the park in other ways and as a result has left the Court no alternative but to find that the government has proved beyond a reasonable doubt that he was sleeping overnight, and therefore "camping," in Lafayette Park.

Accordingly, an accompanying Order will find defendant guilty as charged in the Information and set a date for sentencing.

## ORDER

For the reasons stated in the accompanying Memorandum, it is this 8th day of December, 1988, hereby

ORDERED: that defendant's motion to dismiss the information should be, and is hereby, DENIED; and it is further

ORDERED: that upon consideration of the evidence in this matter, defendant should be, and is hereby, adjudged GUILTY of the offense charged in the information and shall appear for sentencing on February 17, 1989, at 9:00 a.m. A pre-sentencing hearing may be held, if necessary, on February 13, 1989, at 1:45 p.m.